THOMAS T. SWANN, Auditor, *v.* R. S. BUCK, Dist. Attorney.

1. MANDAMUS: PRACTICE.—On application for a mandamus, the practice in this State is to apply by petition to a judge in vacation for the alternative writ of mandamus, to which a return is to be made. If good cause is not shown by the return for non-compliance with the alternative writ, then a peremptory mandamus issues.

2. MANDAMUS: IN WHAT CASES GRANTED.—Whenever a statute gives power to, or

Swann *v.* Buck.

imposes an obligation on a particular person, to do some particular act or duty, purely ministerial, and provides no specific remedy on non-performance, a mandamus will be granted.

3. MANDAMUS: WHEN GRANTED TO ENFORCE PAYMENT OF DEMANDS AGAINST THE STATE.—A party, to whom the State is indebted, may, by mandamus, compel the auditor to issue his warrant on the treasurer for the amount of the claim, when the right of the party and the amount due is clearly ascertained, and there is an existing appropriation for its payment.

4. REMEDY TO ENFORCE UNLIQUIDATED DEMANDS AGAINST THE STATE.—The only remedy to enforce uncertain and unliquidated demands against the State, is by application to the legislature.

5. ACTS OF THE LEGISLATURE: CONSTITUTIONAL PROVISION IN REFERENCE TO ENACTING CLAUSE: WHAT, A COMPLIANCE WITH.—It is not required that the legislature should literally adhere to the formula of words prescribed by the constitution of the State as to the " style of the laws:" they should show on their face the authority by which adopted, and that it was the intention of the legislative power that they should have the effect of a law.

6. SAME: CASE IN JUDGMENT.—The legisture passed an act, with the enacting clause in this form: " Be it resolved," instead of " Be it enacted," as in the formula prescribed in the constitution.—Held, That it was a substantial compliance with the constitutional requisition.

7. JOINT RESOLUTIONS OF LEGISLATURE: DIGNITY AND EFFECT OF.—Joint resolutions of both houses of the legislature are constitutional, and bear equal dignity with bills, and have the same effect to repeal or modify existing laws.

8. STATUTES: LEGISLATIVE ROLLS, EFFECT OF.—Acts of the legislature, enrolled, signed by the preceding officers of the two houses, approved by the governor, and deposited in the office of the Secretary of State, have all the legal incidents of a record, import absolute verity, and are incapable of contradiction.

9. STATUTES: JOURNALS OF LEGISLATURE.—The courts will not take judicial notice of the journals of the legislature in order to ascertain the facts on the passage of a law.

10. AUDITOR OF PUBLIC ACCOUNTS: DUTY OF: POWER OF LEGISLATURE TO CHANGE EXISTING REGULATIONS AS TO ALLOWANCE AND PAYMENT OF CLAIMS AGAINST THE STATE.—The duty of the auditor to examine, state, settle, and audit claims against the State, and issue his warrant upon the treasurer for those authorized to receive the same, is a part of the system for the safe keeping and disbursement of the public money, and a means of making prompt payment to the creditor, and not a remedy provided for the enforcement of his demand, and the legislature has the power to change existing regulations in reference to the allowance of claims and issuance of warrants by the auditor.

11. CONTRACTS: CONSTITUTION: WHAT CONTRACTS OF A STATE PROTECTED BY.—The grants and executed contracts of a State are within the inhibition of the Constitution of the United States, "that no State shall pass any law impairing the obligation of contracts," but its executory contracts have no other than a moral sanction, and depend upon good faith for their performance.

12. OFFICES.—Offices, in this country, are not held by grant, nor do they partake of the character and quality of a contract between the State and the officer; they

are mere agencies of a political nature, in which the agents have no proprietary interest.

13. CONSTITUTION: OFFICES AND OFFICERS: POWER OF LEGISLATURE OVER.—The proper authority in a State may terminate an office without regard to the rights, term, or future salary of the incumbent, may alter and increase the duties or diminish prospectively the compensation of officers.

15. CONSTITUTION: STATUTES: WHEN TO TAKE EFFECT: HOW DETERMINED.—The constitution of the State declares, " that laws of a general nature, unless otherwise provided, shall take effect within sixty days after their passage." It need not be affirmatively expressed that the law shall take effect immediately; it may be inferred from the intention of the legislature in passing the law.

15. CONSTRUCTION OF STATUTES.—One part of a statute is called in to help in the construction of another part, and they are to be so expounded as to support and give effect to the whole.

16. CONSTRUCTION OF STATUTES.—In order to ascertain the intention of the legislature, all acts " *in pari materia* " are to be taken together and compared.

17. CONSTRUCTION OF STATUTES: REPEAL BY IMPLICATION.—Repeal of statutes by implication is not favored by the courts. A subsequent statute, not repugnant in its provisions to a former one, but clearly intended to prescribe the *only* rule in the case provided for, repeals the former statute.

ERROR to the Circuit Court of Hinds county. Hon. John Watts, judge.

On the 24th of November, 1865, defendant in error presented his petition, to which his affidavit was made, to the Hon. D. O. Merwin, judge of the Criminal Court of Warren county, in which it was represented that the State was indebted to petitioner in the sum of $2,407, for services rendered as district-attorney from October, 1863, to 22d May, 1865. That petitioner was duly elected to the office of district-attorney of the third judicial district, and that his term of office has expired. That on the 10th day of November, 1865, he had applied to Thomas T. Swann, auditor, to issue his warrant on the State treasurer for the amount, and that he had refused.

The prayer of the petition was for the writ of mandamus directed to T. T. Swann, auditor, commanding him to appear before Hon. John Watts, judge of fourth judicial district, at Jackson, on Thursday, the 7th day of December, 1865, then and there to show cause why said writ of mandamus should not be made peremptory, and he be required to issue his warrant upon the State treasurer for the sum of $2,740, and to do and per-

Swann v. Buck.

form such other and further acts as he may be required by the court to perform.

The fiat of the judge was addressed to the clerk of the Circuit Court of Hinds county, commanding him, upon petitioner entering into bond in the penalty of $500, payable to T. T. Swann, with security to be approved by the clerk, to issue writ of mandamus as prayed for, as well as a writ of subpœna.

Upon the execution of the bond, the clerk of the Circuit Court of Hinds county issued the alternative writ of mandamus, addressed to the sheriff of Hinds county. The writ was returned duly executed.

On the 2d December, 1865, Thomas T. Swann, auditor, made his return to said writ, in which he stated that he had declined to issue his warrant for the amount claimed by petitioner on the ground that he was interdicted from so doing by a joint resolution adopted by the legislature of the State of Mississippi at its present session, and approved 25th October, 1865, and in the following words : " Resolved, by the legislature of the State of Mississippi, that the auditor of public accounts be and he is hereby directed to issue no more warrants upon the treasurer for the payment of money until further orders."

Petitioner, on the day set for the hearing, moved the court for an order upon the return of defendant Swann, making the writ of mandamus peremptory, which motion was sustained by the court.

To the action of the court, in sustaining the motion for a peremptory mandamus, defendant Swann prayed for a writ of error, returnable to the next term of the High Court of Errors and Appeals.

*C. E. Hooker*, attorney-general, for plaintiff in error.

This was an action begun in the court below by petition for writ of mandamus by the defendant in error, against the auditor of public accounts, for a balance alleged to be due defendant in error for services as district-attorney of the third judicial district of the State of Mississippi.

The petition was filed on the 24th of November, A.D. 1865, before Judge Merwin, of the Criminal Court of Warren counyt,

who issued his fiat commanding the issuance of the writ returnable before the Hon. John Watts, sitting at Jackson, Hinds county, at the December Term of the court of said county. The return of the auditor shows that he was forbidden by law to issue any warrant on the treasury until further orders, by a joint act of the legislature of Mississippi, approved October 25, 1865, page 252, session acts of 1865. The court below, on motion, made the writ peremptory against the auditor, and required that he should issue his warrant on the treasury for the amount claimed to be due in the petition of the defendant in error.

It is assigned for error, that the court erred in rendering this judgment against the auditor, and that the writ will not lie against him, requiring the performance of an act forbidden by law.

The constitution of the State provides (see section 20, article 5, Court of Miss.) that " A State treasurer and auditor of public accounts shall be elected by the qualified electors of the State, who shall hold their offices for the term of two years, unless sooner removed."

The constitution does not prescribe the duties of the auditor of public accounts, and we are compelled to look to the statutory provisions made from time to time, prescribing the duties of this officer, to ascertain what are the duties of his office. These duties are defined by articles 32 and 48 inclusive, section 3, chapter 6, Rev. Code, pages 108 to 110.

Is it in the power of the legislature to alter, change, or modify the existing law prescribing the duties of auditor of public accounts ; and if so, is it in the power of the legislature to change his duties by a joint resolution of the two houses of the legislature? This point was urged with great earnestness in the court below, and it is to be presumed will be urged upon the court now. That, inasmuch as the constitution requires that "no bill shall have the force of a law until on three several days it be read in each house, and free discussion be allowed thereon, unless four-fifths of the house in which the bill may be pending may deem it expedient to dispense with this rule," and as there is no such rule with regard to joint resolutions, that therefore they are not of equal dignity

as legislative enactments, and an act passed in accordance with the constitutional rule quoted above, is not subject to be repealed by a joint resolution of the two houses of the legislature, approved by the executive.

This position is not tenable, we submit, under the legislative practice prevailing in this country, by the rules of the Senate of the United States (see Rules, from 25 to 30, inclusive), and by the rule of the House of Representatives; and by the joint rules of the two houses (to be found on pages 107 to 110, inclusive, of "Legislative Guide"), joint resolutions requiring the signature of the presiding officer of each house, and the approval of the Executive, are treated of equal dignity and authority with bills "*co-nomine*," and why should not the legislative will find its expression as well by a joint resolution as by bill?

The joint rules of the houses of the Mississippi legislature speak of bills and resolutions in the same terms. (See Rules Nos. 5, 10, 12 and 13, Joint Rules both Houses.) (See Rule No. 10, Constitutional Rules of Mississippi Legislature.)

It seems to have been such a universal practice in legislative assemblies in this country to give expression to the legislative sense, in the form of joint resolutions, that it is difficult to find authorities on the subject; the only enlarged work on parliamentary law that I have been able to find, sustained the views here expressed. Cushing's Law and Practice of Legislative Assemblies, section 2403, page 930, lays down the rule that this form of legislation is common and usual. He says:

"A form of legislation which is in frequent use in this country, chiefly for administrative purposes, of a local or temporary character, sometimes for private purposes only, is variously known in our legislative assemblies as a joint resolution, a resolution, or a resolve.

"This form of legislation is recognized in most of our constitutions, in which, and in the rules and orders of our legislative bodies, it is put on the same footing, and made subject to the same regulations, with bills properly so called, In Congress a joint resolution, which is the name given in that body to this kind of legislation, is there regarded as a bill."

18

If, then, it is competent for the legislature to repeal the existing law by joint resolution, and they have so repealed existing laws prescribing auditory duties, can we go behind the enrolled resolutions of the two houses, as it remains in the office of the secretary of State, to inquire whether it has been passed in accordance with the constitutional rule, requiring all bills to be read on three several days before they shall become a law?   This court, in the case of *Green* v. *Weller*, 3 George's R., page 650, which was very freely argued and deliberately considered by the court, decide:

" That the enrolled acts of the legislature, when signed by the speaker of the house of representatives and president of the senate, and approved by the governor, and deposited in the office of the secretary of State, like the parliament rolls in England, are records, and import absolute and uncontrollable verity.   They are conclusive evidence of the due enactment of the statutes contained in them, and cannot be impeached in any manner whatever."   This question, then, of the powers of the legislature to change existing statutes by a joint resolution of the two houses, approved by the executive, being disposed of, and the court having decided that we cannot go behind the enrolled act in the secretary of State's office, to inquire into the regularity of its passage, the question recurs, how far does this act of the legislature change or amend the existing laws prescribing the duties of the auditor of public accounts?

We have seen that while the office is created by the constitution, it has been left to the legislature to prescribe the duties of this officer.   That they have done so, in the articles of the code above referred to ; and in the passage of the resolution of the legislature, the consideration of which is now involved, the question is presented of the power of the legislature to repeal its former acts prescribing the duties of a public officer, and how far the rights of parties having claims against the State may be affected thereby.

The duty to audit and examine claims against the State, and to issue warrants for their payment, " for all moneys, which by law are directed to be paid out of the treasury, specifying, etc."

was devolved upon the auditor, by the act contained in Rev. Code, page 108, articles 32 and 33. By the act of the legislature, expressed in the form of a joint resolution, passed at the October session, A.D. 1865, the auditor was forbid " to issue any further warrants on the treasury, until otherwise ordered." Each of these acts are by the same authority, and each are intended to prescribe a rule of conduct to a public officer, entirely within the control and direction of the legislature. The effect of a repealing statute is ably discussed by Justice Cowen, in the case of *Butler* v. *Palmer*, 1 Hill N.Y. Rep., page 326. Justice Cowen, in this case, on the general power to repeal, says :

" But independently of constitutional restraint, no approved writer can, I apprehend, be found either on our own or the civil law or the law of nations, who has denied the abstract power to repeal. Indeed this power in our own legislature, was expressly asserted and acted upon in the *People* v. *Livingston*, 6 Wend. 526, and that, too, in respect to an inchoate right of redemption. The question is thus reduced to one of mere construction on the repealing clause before us."

He cites the opinion of Lord Chief Justice Tindal in *Key* v. *Goodwin*, 4 Moore & Paine, 341, in which he says : " I take the effect of a repealing statute to be to obliterate it (the statute repealed) as completely from the records of the parliament, as if it had never passed ; and that it must be considered as a law that never existed, except for the purpose of those actions or suits which were commenced, prosecuted, and concluded whilst it was an existing law." Judge Cowen proceeds to say : " It will be perceived that the rule laid down in this and several other cases, has no respect whatever to the circumstance, that the repealed statute was either of a criminal or jurisdictional character. Nor is it perceived why, in case of a civil right, an exception is not just as practicable, in favor of a jurisdiction given to enforce the right, as of the right itself."

Now it may, and probably will be said, that there was no actual repeal of the former statute by the passage of the joint resolution of 1865. True, there was not in terms, but in substance and effect there was a virtual repeal.

The same power which had invested the auditor of public accounts with the rights, powers, and duties as to claims; against the State, by the provisions of the Code, page 108, had prescribed a new rule of action for this public officer, which he was bound to follow ; and when the claim of defendant in error was presented, he properly declined to audit and allow the same.    This claim had been held up for years; at any time within the past ten years, the claim would have been audited under the provisions of the Code act.    The salary of the defendant in error was payable quarterly, and could have been drawn at any time by compliance with the then existing law.    He has slept upon his rights to draw this salary, until the act authorizing the auditing and allowance of his claim has been repealed, by the same competent authority which passed it. This method of paying the public officers of the State is, by act of the legislature, no longer in existence, with reference to claims against the State prior to    day of November, 1865 ; and the defendant in error can invoke this peremptory proceeding to compel a public functionary to disregard the positive enactments of law defining his official duties.

With reference to the question of the power of the legislature, to repeal the existing laws by a joint resolution, the court is referred to the decision in the case of *Culder* v. *Bull*, S. C. U. S. Repts., Curtis, volume 1, page 269, in which they say that by a joint resolution the legislature may enact laws affecting rights of parties, and give a lengthy opinion as to whether the act referred to is violative of the rights (vested) of the parties affected by it.

But aside from the question of the propriety and constitutionality of the act of 1865, had the law stood as enacted (page 108, Rev. Code), would the writ of mandamus be the proper remedy to coerce the incumbent of the auditor's office to discharge the administrative duties imposed upon him by the law ? And is it the proper remedy of a party who has a claim against the State ; and may it be applied as against the government, by making it directed to one of her administrative officers. ?

The courts, everywhere both in England and in the United

States, decide that this writ will not lie to correct the *exercise of discretion and judgment*, in an inferior tribunal or person, however plain and apparently just may be the claim in aid of which it is invoked. To this point I invite attention of the court to the following cases : Bacon's Abridgment, volume 6, title Mandamus, page 422 ; Blackstone Com., volume 3, page 266, notes. *Judges Oneida C. P.* v. *The People*, 18 Wendell, page 79.

The constitution provides, section 7, article 7, under the head of general provisions, that "no money shall be drawn from the treasury but in consequence of an appropriation made by law."

The means under the general law of drawing money from the treasury, is by a warrant of the auditor of public accounts addressed to the treasurer. If the resolution was properly passed, no warrant could be issued.

Another provision of the constitution (section 10, article 7), under head of general provisions declares, " The legislature shall direct by law in what manner, and in what courts, suits may be brought against the State."

At one time there was an act of the legislature, directing in what tribunal the State might be sued. But at present there is no existing statute giving remedies to parties having claims against the State. The constitution proceeds upon the idea that such provision is necessary before any suit can be brought against the State. And yet this claim, sought to be recovered, is a claim against the State of Mississippi, and is sought to be enforced by the peremptory writ of mandamus, in favor of the claim of the defendant in error, or set up in his petition against the State, and it is sought to be enforced, by a command from the Circuit Court, addressed to one of the executive officers of the government, requiring him to perform an act which the government by most positive enactment has declared he shall not do.

This is a perversion of the writ of mandamus from its original scope and purpose, which was a command from some superior authority (as the Court of King's Bench in England),

requiring the inferior tribunals to perform certain clearly and well-defined duties prescribed by law, requiring certain acts to be done or omitted.

If this writ can be upheld, and the auditor be required, in face of the direct and positive requirements of law, to issue his warrant on the treasury for the amount claimed by the defendant in error, then there is no claim against the State which may not be enforced by this peremptory proceeding, notwithstanding the absence of any statute directing how, or in what manner, suits may be instituted against the State.

This writ is at all times used by courts with extreme caution, and never in doubtful cases, and it is only used to compel the performance of a mere ministerial act, or requiring the party to whom it is addressed to do a specific thing enjoined by law, in which the party has no discretion.

When there is discretion and judgment to be exercised by an executive officer, we submit that he is not subject to be directed and governed by a mandamus issuing from any court; and in support of the position, we cite the following cases: *Brashear* v. *Mason,* 6 Howard Supreme Court R., volume 6, page 92; *Decatur* v. *Paulding,* 14 Peters' R. 497; *Kendall* v. *United States,* 12 Peters, 524; *School Inspectors of Peoria* v. *People,* 20 Ill. R. page 531. In *Brashear* v. *Mason,* the question is directly presented, as to whether the head of a department can be proceeded against by mandamus to compel the payment of an officer's salary.

In this case Brashear, who was an officer of the Texas navy at the period of annexation in 1845, claimed that he was entitled to salary as an officer of the U. S. navy, after the annexation, and endeavored to enforce its collection against John Y. Mason, the secretary of the navy, by the writ of mandamus, and made application for the writ to Circuit Court of Washington county, District of Columbia, which was refused, and the case brought to Supreme Court by writ of error. Mr. Justice Nelson delivered the opinion of the court, and after speaking of the facts of the case, says:

"We are also of opinion, that if the plaintiff had made out a

title to his pay, as an officer of the United States navy, a man-
damus would not lie in the court below to enforce the pay-
ment." Commenting upon the impropriety of reverting to the
writ, for the purpose for which it was sought to be used in this
case, the court proceed:

"It will not do to say, that the result of the proceeding by
mandamus, would show the title of the relator to his pay, the
amount, and whether there were any moneys in the treasury
applicable to the demand; for upon this ground, any creditor
of the government would be enabled to enforce his claim against
it, through the head of the proper department, by means of this
writ, and the proceeding by mandamus would become as com-
mon, in the enforcement of demands upon the government, as
the action of assumpsit, to enforce like demands against indi-
viduals." "For these reasons we think the writ of mandamus
will not lie in the case."

In the case of *Decatur* v. *Paulding* (which was an action
by mandamus, to compel the Secretary of the Navy to pay to
the widow of Commodore Decatur the amount alleged to be
due under the general pension act, and the amount due her by
the resolution of Congress in her favor on the 3d of March,
1837), the Supreme Court lay down the same doctrine.

Chief-Justice Taney, delivering the opinion of the Court,
says:

"The duty was to be performed by him, by the resolution, as
the head of one of the executive departments of the govern-
ment in the ordinary discharge of his official duties. In gen-
eral such duties, whether imposed by act of Congress, or by
resolution, are not mere ministerial duties. The head of an
executive department of the government, in the administration
of the various and important concerns of his office, is continual-
ly required to exercise judgment and discretion. He must ex-
ercise his judgment in expounding the laws and resolutions of
Congress, under which he is from time to time required to act.
If he doubts, he has a right to call on the Attorney-General to
assist him with his counsel; and it would be difficult to imag-
gine why a legal adviser was provided by law for the heads of

departments as well as for the President, unless their duties were regarded as executive, in which judgment and discretion were to be exercised."

There is not a single argument of the court in the case of *Paulding* v. *Decatur*, which will not apply with equal force to the auditor of public accounts, in the case now before the court. By the act of Congress of July 11, 1832, the Secretary of the Navy has charge of the pension fund, and it is made his duty to *grant* and *pay* the pensions according to the terms of the act of Congress. The act of the legislature of Minnesota gives to the auditor of public accounts (page 108, Code) a discretion as broad as that with which the act of Congress invests the Secretary of the Navy. The statute makes it the duty of the auditor:

" To examine, state, settle, and audit all accounts, claims, or demands whatsoever against the State, arising under any act or resolution of the legislature, and to grant to every claimant *authorized to receive the same*, a warrant on the State treasury, etc.

" The auditor shall draw warrants on the State treasurer, payable to the order of the person applying for the same, for all moneys which, by law, are directed to be paid out of the treasury, etc."

Full discretion is thus given to the auditor to determine the justice and propriety of the claim presented, and full power to judge and determine whether there be any law or resolution of the legislature authorizing him, as one of the heads of State department, to pay the same; and to deprive him of the power of determining these matters, or to make his action subject to revision and control by the writ of mandamus of a court, is to give the judiciary the key to the treasury, and complete control of the funds of the State, and to deprive the legislature of all power over the treasury of the State, by making its executive officers amenable, not to the power which appointed them, but to varying, and perhaps conflicting judgments of the various tribunals to whom application may be made for writs of mandamus to adjust and determine their claims against the State.

It will probably be urged that right and justice require that some summary method should be enforced by which public officers might coerce the State to the payment of their salaries justly due to them. This may be true; but public servants, like all other creditors of the government, must trust to the justice of the government.

The legislature was no doubt induced to the passage of this act, suspending for the time the power of one of its administrative officers, in order to subserve some great public interest.

The State government just reconstructed, was struggling for the means of support; large claims were known to be held by officers, which had been withheld from presentation during the war, when the treasury was replete with confederate cotton notes, and the State's own issues; the legislature had required by another act, all sheriffs and tax collectors to receive their commissions in the funds collected by them, and they, perhaps, thought it but an act of public justice, that the civil functionaries of the government should receive their compensation in the same character of funds that the State had paid her ill-fed and ill-clothed army during the war; and as this was not practicable, that at least these hungry claimants might be deferred for a while, until the State's resources could be collected under her general revenue laws.

But whatever may have been the motive for the passage of the act, and whether founded in good or bad policy, it is sufficient for the purposes of the argument that it is the law; and that, looking to his duties under the law, the auditor of public accounts was compelled to observe its provisions, and be governed by them in his official acts.

The writ of mandamus has been frequently resorted to in this State; but I have not been able to find any case directly in point. In one of the earliest cases decided in this court (*Madison County Court* v. *Alexander Walker*, 523), the court simply decide, that when the court is bound to do a particular act by law, they will enforce the performance of this act by mandamus, but will not interfere with the manner of the decision.

In the case of *Ross* v. *Lane,* which was a mandamus against the tax collector of Rankin county, to require the tax collector to levy and collect a certain amount alleged to be due the relator, etc., the court decide that " an application for a writ of mandamus is addressed to the sound legal discretion of the court, and will not be awarded to enforce the performance of an act which is contrary to law."

This case is reported in 3 S. & M., page 695. In case of *Swan* v. *Work,* 24 Miss. R., which was an action by mandamus to recover certain amount alleged to be due relator, the court say :

" A different rule prevails as to judicial and ministerial officers. They can only know equity or justice in the manner in which the law has defined it. They must act under the mandate of the law, and can only give the party such relief, on his claims against the State, as the law authorizes."

The universal current of the authorities both in England and in the United States is, that where the inferior tribunal is invested with discretion, the courts may award a mandamus to compel action, but not to direct what is the proper action. See *The People* v. *Judges of Dutchess C. P.,* 20 Wendell, 662, where the principle above indicated is laid down, and the court proceed to say : " There are many cases where, though the party has no other remedy, a mandamus will not lie." And in the case of *Judges of the Oneida C. P.* v. *The People,* 18 Wendell's R., page 82, the court go elaborately into the consideration of the question as to what cases a mandamus will, and when it will not, and affirm the position already taken by the Supreme Court of New York, that the writ will not lie to any inferior tribunal to determine how or in what manner it shall exercise its discretion.

If, as before observed, this writ can be successfully invoked in this case, and stepping behind the constitutional provision, which seems to require that the legislature must, by act, declare in what tribunal the State shall be sued before actions can be begun against her (for this is clearly nothing but an action against the State, in the name of one of her public function-

Swann *v.* Buck.

aries), then there is no claim which may not seek its enforce-
ment by writ of mandamus, which in effect substitutes the
discretion and judgment of each court, to which the application
may be made, for the discretion and judgment of the public
officers selected by the people and acting under the rules laid
down by their representatives. There has been a great dispo-
sition to extend the latitude of this writ in many of the State
courts, where the sole questions considered were the equity and
justice of the individual claims under consideration, and not the
propriety of the issuance of the writ, as to the subject-matter
which it attempted to bring before the court, or the person
whose acts it attempts to review. It was well said by Lord
Mansfield, "That it was a very beneficial writ; but that the
best mode of preserving it was to be sparing in the use
of it."

*Thomas J. Wharton*, for defendant in error.

This suit originated upon a claim of the defendant in error
for $2,407, for salary due him as district-attorney for the third
judicial district from October, 1863, to 27th May, 1865. The
plaintiff in error, as auditor, etc., having refused to issue a
warrant upon the treasurer for the amount due to him as afore-
said, the defendant applied for a writ of mandamus, which
was granted. The plaintiff in error, in answer to the writ,
made return, admitting that the account for his services ren-
dered by defendant in error, as set out in his petition for said
suit, was correct, but that he was forbidden to issue his warrant
upon the same by the act of the legislature of 25th October,
1865, by which he was "directed to issue no more warrants
upon the treasurer for the payment of money until further
order." The court below made the writ peremptory, and from
that judgment this writ of error is prosecuted.

I maintain that said judgment is correct, and should be
approved in this court.

1. There was a contract between the State and the defendant
in error, by which, in virtue of his election at the time, and in the
manner prescribed by law, he acquired a vested right or estate

in the office for the term prescribed; and upon performance by him of his part of said contract, by the discharge of the duties of the office to which he was elected, he became entitled to the salary affixed by law to said office.

It is not distinguishable in principle from a contract between individuals, in which one of the parties, having performed all the terms and conditions assumed or imposed by him, has the right to claim and enforce performance by the other party of the terms and conditions assumed by or imposed upon him. (4 Peters' R. 560; Smith's cases, 268, 272, 384, 549, 590.) The constitution, article 4, section 25, provides that "there shall be an attorney-general elected by the qualified electors of the State; and a competent number of district-attorneys shall be elected by the qualified electors of their respective districts, whose compensation and term of service shall be prescribed by law."

The legislature has provided by law for the election and term of office of the district-attorneys (Code 90, article 2); and by page 140, article 1, what shall be the salary affixed to said office, and how and when such salary shall be paid, viz.: "in quarterly payments, after being audited according to law." By article 32, Code, 108, it is provided, that " it shall be the duty of the auditor to examine, state, settle and audit, all accounts, claims, or demands whatsoever against the State, arising under any act or resolution of the legislature, and to grant to every claimant, authorized to receive the same, a warrant on the State treasury," etc.

In this case, as shown by the auditor's return to the writ, he did examine the account of the defendant in error, furnished him the statement sued upon, and admits the same to be just and true; and places his refusal to issue the warrant upon the treasurer, for the amount, alone upon the prohibition contained in said resolution of the 25th October, 1865.

2. I insist that said resolution is no sufficient bar to the claim of the defendant in error; and although, in the first instance, it may be the duty of the auditor, as a mere executive officer, to obey its mandate until it is declared by this tribunal to be

invalid; it cannot for a moment be sustained by judicial sanction or authority. This position is clearly sustainable upon two points : 1st. That it is *retrospective*, and violative of the *vested rights* of the defendant in error, and therefore impairing the obligation of the contract between the State and him, which was not in the power of the legislature, under the grant of authority in the constitution (see Constitution, Declaration of Rights, article 1, section 19); and 2. Even if it had been passed by the. legislature in the just exercise of its constitutional powers, it was not passed in such form as to entitle it to the dignity and force of *a law*.

On the first of these two points I refer to the case of *Smedes and Marshall* v. *State*, 26 Miss. R., 49 ; Smith Cases on Const. Law, pages 384, 385 ; 6 Cranch, 135, 136 ; 7 Id. 164.

The constitution, article 3, section 23, Code, page 28, declares that "no bill shall have the force of a law, until, on three several days, it be read in each house." It makes no provision as to *resolutions*. They depend on custom and usage. The court judicially knows, as a part of the legislative history of the State, that by joint resolutions of the two houses, resolutions are only required to be read on *two* several days. The *presumption* would be, that this resolution was, therefore, under the operation of that rule, only read on two several days.

But be this as it may, and whether the court will indulge this *presumption* or not, I insist that the laws prescribing the term and affixing the salary to the office of district-attorney, are *general laws*, or laws of a general nature, passed in pursuance of the requirements of the provisions of the constitution just cited, as to the number of days on which they shall be read, and even if it was in the power of the legislature by a subsequent enactment, to repeal a general law under which *rights had vested*, still, it could only do so by a law *of equal dignity*, and passed with equal solemnity. Smith Cases on Const. Law, 595, section 430.

Again, even if the resolution had been passed in conformity with *that* provision of the constitution, and was free from objec-

tion on that ground, there is another constitutional objection which is fatal to it, when the effect and operation of a *general law*, or law of a general nature, is claimed for it, and that is this :

" The legislative power of the State shall be vested in two distinct branches : the one to be styled ' the senate,' the other ' the house of representatives,' and both together ' the legislature of the State of Mississippi ;' and the style of their laws *shall be,* ' *Be it enacted by the legislature of the State of Mississippi.*' " *I italicise* the words because they are italicised in the *constitution.* These words are omitted in the resolution.

The very fact that the constitution has been so careful as to provide the *style*, even the very words, in which the enacting clause of a *general law* shall be stated, whilst there is a total omission of that provision in reference to *resolutions*, as also in prescribing the number of readings in the latter case, is to be accepted as significant, and shows that a *resolution* was not to have the dignity nor to perform the office of a *general law*.

As to the necessity of pursuing strictly the words prescribed, I refer to the law and practice of legislative assemblies by Cushing. Cush. L. and P. 820, section 2102.

Again, laws of a general nature take effect after sixty days from their passage, unless otherwise provided. Const., article 7, section 6 ; Code, 35.

This resolution, if regarded as a *general law*, would, therefore, as it does not otherwise provide, not have taken effect until *25th December*, 1865, whereas, it is interposed as a defence by the auditor to this case on the 4th December, 1865.

As to cases in which writ of mandamus will lie, and the court to issue it. 3 Bac. Ab. title, information (A).

A further and conclusive point in favor of the defendant in error, on the question of the resolution referred, and of its impairing the obligation of the contract with the State, is furnished by the legislature itself, in imposing a tax upon salaries or services already rendered in public office.

I cite, without special classification, the general principles applicable to the case at bar : 8 B. Mun. R. 648 ; 5 Binney, 87 ; 23 Wend. R. 459 ; 41 Maine, 20 ; 5 Peters, 560 ; 2 Hill (N. Y.) R. 45 ; 6 Cranch. R. 135, 136 ; 7 Ib. 165 ; Law and Pr. Leg. Assemblies, 819, sections 2101, 2102.

On the point of jurisdiction not being in the Circuit Court, I reply that, first, the jurisdiction of this court is *exclusively appellate ;* second, that in the numerous cases of mandamus which have come before this court, every one of which originated in the Circuit Court, no doubt was ever expressed as to the jurisdiction of these courts. 11 S. & M. 49, 50 ; 9 Ib. 90 ; 24 Miss. R. 444 ; Ib. 468, 471.

If it be true that the Circuit Court had not jurisdiction, even if the point had not been made in the cases which came to this court, still, was not this court bound judicially to take notice of it ? For if the Circuit Court had not jurisdiction in the first instance, then this court has not jurisdiction on writs of error, and, therefore, this court was bound to inquire into the question to determine *its own jurisdiction.*

There was no *judicial* act to be performed in this case by the auditor. It was a mere *ministerial* act. He had only to refer to the records in his own office to ascertain up to what time the defendant in error had drawn his salary, so as to compute the amount due at the date of the demand, for the law in force when the services were rendered, and the demand, had fixed the amount. It is in reference to cases in which he is called upon to perform acts requiring the taking of *proof*, where the claim is not fully *fixed* by law, and in which is involved not merely a *ministerial* act, but the exercise of *judicial* function in some matter of doubt, that the authorities cited by the attorney-general apply.

But it is said the defendant was in a district of country occupied by the *enemy.* Well, suppose he was ; it was his *misfortune*, not his *fault.* He was in the limits of the district in *which he was elected*, and in which his official duties required him to reside. The government of the State and of the Confederate States was overthrown by military power.

Suppose he had been captured and transported to a northern prison, and thus debarred of the power to perform his official duties, would it be pretended that he was thus *ousted* of his office, and deprived of his right to the salary affixed to it? Even in districts of the State not thus subjugated and held by military power of the enemy, the courts were suspended; and would it be said that because the judges of the Circuit Courts in those districts failed to hold the terms of their courts, and thus the district-attorneys had no duties to perform, that they thereby forfeited their right to their salaries? Was the defendant guilty of any malfeasance or misfeasance in office? This is not pretended.

But this question, as well as that of want of jurisdiction in the Circuit Court to order the writ of mandamus, cannot arise in this court. They were not made in the answer, and have not been assigned for issue here.

ELLETT, J., delivered the opinion of the Court.

The defendant in error, who was elected in October, 1862, to the office of district-attorney of the third judicial district, composed of the counties of Tunica, Coahoma, Bolivar, Washington, Issaquena, and Warren, instituted this proceeding in the Circuit Court of Hinds county, against the auditor of public accounts, to obtain a writ of mandamus requiring the auditor to issue a warrant on the treasurer for the sum of $2,407, the amount claimed by the appellee to be due to him on account of his salary from October, 1863, to May 22, 1865. On the hearing of the case a peremptory mandamus was awarded, and from this judgment a writ of error is prosecuted.

The writ of mandamus is not a writ of right, and does not pertain to the ordinary jurisdiction of the courts of common law. In England, whence we derive it, it is a prerogative writ, applicable only to extraordinary occasions, for which the law furnishes no other specific remedy. It can be issued only by the Court of King's Bench, and in virtue of the peculiar character and constitution of that tribunal, and its very high and transcendent jurisdiction. A large portion of the extensive

Swann *v.* Buck.

powers of that court in superintending inferior jurisdictions, commanding magistrates and others to do their duty, and enforcing obedience to acts of parliament, is exercised by the agency of the writ of mandamus. In practice, an application is made to the court, supported by affidavits, for a rule on the party to show cause, on a day certain, why the writ should not be issued. This rule, on the hearing, is usually made absolute for an alternative mandamus, if any right be shown on the part of the prosecutor to that which he seeks, or if the case be one which the court thinks worthy of fuller examination and discussion, or if there be questions of law which ought to be put in a more solemn train for inquiry, without determining whether a peremptory writ will or will not be ultimately awarded. Tapping on Mandamus, 351 (303).

We have no court in Mississippi possessing the extraordinary powers of the court of King's Bench, to whose cognizance the writ of mandamus would belong without constitutional or statutory regulation. Accordingly, our constitution provides that "the Circuit Court shall have original jurisdiction in all matters, civil and criminal, within this State," and the statutes confer upon that court original jurisdiction of "all civil suits and actions," and of "all causes, matters and things, arising under the constitution and laws of this State, which are not expressly cognizable in some other court established by law." (Rev. Code, 482, article 29.) Power is given to the judges of the Circuit Court, in term time or in vacation, to allow writs of mandamus (Rev. Code, 479, article 9), and similiar power is bestowed upon the judges of this court, in reference to all remedial process. (Rev. Code 561, article 3.) Under these provisions, in the absence of further regulations, the practice has been adopted of applying by petition to a Judge in vacation for the issuance of an alternative writ of mandamus, returnable to the Circuit Court having local jurisdiction. The petition thus comes in place of the rule to show cause in England, and the fiat of the Judge is equivalent to the rule absolute. Beyond these necessary modifications, the court is left to be guided in the proceedings, by the rules of the common law, although these rules have

been materially altered in England by act of parliament as long ago as the reign of Queen Anne, in 1711, and the remedy by mandamus thereby made greatly more comprehensive and beneficial.

It is not necessary to attempt an enumeration of the cases to which this remedy is applicable. It is a general rule, that whenever a statute gives power to, or imposes an obligation on, a particular person, to do some particular act or duty, and provides no specific remedy on non-performance, a mandamus will be granted. Tapping 80 (30). There must be a clear legal right, and no specific legal remedy for its enforcement. When directed to a public officer, it must be to enforce the performance of a mere ministerial act, not involving on the part of the officer the exercise of any judgment or discretion. (*Marbury* v. *Madison*, 1 Cranch, 137; *Decatur* v. *Paulding*, 14 Peters, 524; *Brashear* v. *Mason*, 6 How. S. C. U. S. 92.) In the former of these cases the propriety of the remedy was asserted on the ground that the Secretary of State was directed by law to do a certain act affecting the absolute rights of individuals, the performance of which the President could not forbid; and in the two latter it was denied on the ground that the duty sought to be enforced, was not ministerial merely, but required the exercise of judgment and discretion. Stress was laid on the fact that the officers were the heads of the chief executive departments of the government, the various and important concerns of whose offices were executive in their character, and not ministerial. In *Kendall* v. *U. States*, 12 Peters, 524 (613), the writ was sustained, on the ground that the duty sought to be enforced was a "precise, definite act, purely ministerial, and about which the Postmaster-General had no discretion whatever." That the right of a public officer to receive a warrant for the salary attached by law to his office, belongs to the class of cases to which the writ of mandamus is applicable, was expressly adjudged in *Page* v. *Hardin*, 8 B. Monroe, 648, by the Supreme Court of Kentucky, and has been recognized in several cases by this court. And it may be observed generally that in all cases where the right of the party,

and the amount he is entitled to receive from the State, are clearly ascertained by law, leaving no discretion to the auditor, and there is an existing appropriation for its payment, the duty to issue the warrant may be regarded as purely ministerial, and as one, the performance of which, in a case in other respects proper, may be enforced by mandamus.

It is to be observed, however, that a sovereign State cannot be sued without its own consent, and that the only remedy in ordinary cases to obtain payment of a claim against the government, is by application to the legislature; and that the remedy by mandamus is not to be extended so as to become in effect a suit against the State to establish demands which are uncertain, or unliquidated, and which properly fall under the legislative cognizance.

The present case, then, being in its general character a proper one for the application of this writ, the issuance of it is resisted, on the ground that a legislative prohibition exists against it.

By the "act concerning the salaries of officers," (Rev. Code, 140, article 1,) it is enacted, "that the following annual salaries shall be allowed, and paid in quarterly payments, after being audited according to law, to the several officers hereinafter named, to wit: to each district-attorney the sum of $1,500." By article 32, Rev. Code, 108, it is made the duty of the auditor of public accounts "to examine, state, settle, and audit, all accounts, claims or demands whatsoever against the State, arising under any act or resolution of the legislature, and to grant to every claimant, authorized to receive the same, a warrant on the state treasury," etc.

If the rights of the relator depended exclusively upon these provisions, the propriety of awarding a peremptory mandamus would be quite apparent.    But at the last session of the legislature various acts and resolutions were adopted, bearing directly upon this subject, among which is a joint resolution, approved October 25, 1865, in the following words: "*Resolved, by the legislature of the State of Mississippi*—That the auditor of public accounts be, and he is hereby directed to issue no more warrants upon the treasurer for the payment of money, until further orders."

This joint resolution, though it takes the form of a mere mandate to the officer, must, if entitled to have any effect at all, be construed as a repeal, or at least as a supension of the provisions of the code on the subject of the issuance of warrants, and as taking away from the auditor all power to issue a warrant on the treasury for the payment of money until otherwise authorized by law.

The relator contends that this resolution forms no defense to his application for a mandamus, for the followingreasons, to wit:

1. That it is void for want of an enacting clause, in the language prescribed by the constitution.

2. That it was not required to be read or passed with the forms prescribed in case of a bill, and therefore cannot operate to repeal a law formally enacted, not being of equal dignity.

3. ·That, if otherwise valid, it would impair the obligation of the contract between himself and the State, and would take away his vested rights under that contract; and

4. That it did not take effect at all until after the date of the judgment in his favor in the court below, and therefore can have no application.

1. The first question is whether the resolution is void for want of a sufficient enacting clause; and this involves another question, to wit, whether the legislature has the constitutional power to pass a joint resolution at all, to have the force and effect of a law.

By the fourth section of the third article of the constitution, the legislative power of the State is vested in the two branches, which constitute the legislature, and it is ordained that "the style of their laws shall be : *Be it enacted by the legislature of the State of Mississippi.*" As the style of this resolution is, " Resolved by the legislature of the State of Mississippi," if a literal adherence to the formula prescribed by the constitution is required, it would follow that the resolution is wholly void. The question is one that does not seem to have received a judicial decision, so far as we have been able to discover; but in a work cited on the law and practice of legislative assemblies, by ·

Mr. Cushing, the opinion is expressed that this form of enactment must be strictly pursued, and that no equivalent language will be sufficient. In the absence of any authoritative adjudication, we are not prepared to adopt this conclusion. The argument against requiring a literal compliance with any form of words in the enacting clause, as a condition of giving effect to a statute, would be very strong on the score of convenience; for the plainest expressions of the legislative will, and the most urgent in their character, would be constantly liable to be defeated by the slightest omission or departure from the established phraseology. No possible good could be achieved by such strictness, and the greatest evil might result from it. There are no exclusive words in the constitution negativing the use of any other language, and we think the intention will be best effectuated by holding the clause to be directory only. It is necessary that every law should show on its face the authority by which it is adopted and promulgated, and that it should clearly appear that it is intended by the legislative power that enacts it that it should take effect as a law. These conditions being fulfilled, all that is absolutely necessary is expressed. The word "resolved" is as potent to declare the legislative will as the word "enacted." It is true that a resolution may or may not take effect as a law, depending upon the occasion and object of its use. It may be resorted to as a vehicle to convey the opinions or wishes of the legislature on any subject, without prescribing any rule of conduct to be observed. But whenever a joint resolution does undertake to lay down a rule of conduct for any portion of the people of the State, it becomes a law, and will take effect as such, notwithstanding the use of the word "resolved" in its style, instead of the word "enacted." The requirement of the constitution is thereby substantially complied with, and the will of the legislature sufficiently declared.

Joint resolutions, having all the force and effect of laws, are common in the legislative practice of this State, and are to be found among the acts of almost every session, and applicable to almost every variety of subjects. Appropriations of money

from the treasury to various objects have frequently been passed in this form, and no objection has ever been raised to their validity. They are expressly recognized by the constitution, which provides that they shall be presented to the governor and be approved by him, before they take effect, or, if disapproved, shall be repassed by both houses, according to the rules and limitations prescribed in case of a bill (article 5, section 16). By the separate rules of each branch of the legislature, they are required as acts and addresses to be signed by the presiding officers; and by the joint rules of the two houses, they are required to be enrolled, examined and signed, and presented to the governor for approval, in the same manner, and by the same committee, as in the case of bills. Though generally, but not universally, confined to administrative, and local or temporary matters, they form nevertheless one of the known and recognized modes of legislation.

The Constitution of the United States contains the very same provisions in reference to the presentment of bills, orders, resolutions, and votes to the President for his approval, that are found in the State constitution. In reference to "bills," this approval is necessary "before it become a law," and in reference to orders, resolutions and votes, "before the same shall take effect;" upon which a distinction was attempted to be founded in the argument. Yet the constant practice of the Congress has been to enact important measures of legislation, chiefly of the character before referred to, by joint resolution. Both Constitutions contain the same clause, "that no money shall be drawn from the treasury, but in consequence of appropriations made *by law*." And the constant practice, both in Congress and the legislature, has been to make important appropriations of public money from the treasury, by joint resolution; thereby showing, that in the usage and practice of these assemblies, a resolution is regarded as a law, and is in all respects of equal force and effect.

Such a practical interpretation of the constitution, sanctioned by long usage and acquiescence, and hitherto, so far as we can discover, wholly unquestioned, is entitled to great weight, and

ought not to be departed from unless under circumstances of the most imperative character.

The constitutions of a number of the States contain the provision, that " every law enacted by the legislature shall embrace but one subject, and that shall be expressed in the title ;" and among these States are Louisiana and California. In the construction of this clause, the courts of the former State have held it to be improper to give it too vigorous and technical a construction. By following in its applications the rules of a nice and fastidious verbal criticism, the action of the legislature would often be frustrated, without fulfilling the intentions of the framers of the Constitution. 6 La. Ann. 329, 540. In California this section of the Constitution is regarded as merely directory. Such was the contemporaneous exposition adopted and acquiesced in by the legislature, and tacitly assented to by the courts. *Washington* v. *Murray*, 4 California, 388. These observations we think justly apply to the clause of our Constitution prescribing the enactment clause of laws, which was no doubt intended to promote uniformity and precision, without being designed as a condition, upon the strict and literal fulfilment of which, the validity of the law should depend.

2. In support of the second objection, it was urged that as the constitution does not mention resolutions, in prescribing the forms and ceremonies to be observed in the passage of bills, therefore a resolution is not of equal dignity with a bill, and cannot be employed to repeal a general law.

We cannot perceive the force of this position. All legislative acts, duly enrolled, signed by the presiding officers of both houses, and approved by the governor, it appears to us, must stand on an equal footing as to dignity, and must equally prevail as the act of the sovereign power of the State, whether they be " enacted," or only "resolved."

It was insisted also that by a joint rule of the two houses of the legislature, joint resolutions are only required to be read on two several days, and therefore the court must presume that this resolution was passed after two readings only, and hence did not become a law. On the production of the rules of the

legislature, no such rule was found to exist, and the foundation of the argument fell to the ground. But if the fact had been otherwise, we could not have indulged the presumption insisted upon, for in the case of *Green* v. *Weller*, 32 Miss. 650, in reference to this very question, this court, after stating the provisions of the constitution requiring bills to be signed by the presiding officers of the two houses, and to be approved and signed by the governor, and the statutory regulation that all bills thus authenticated shall be deposited in the office of the secretary of state, say—"When an act of the legislature has passed through these forms, which are shown upon its face to have been complied with, and it is filed in the secretary's office, it becomes a record, and has all the legal incidents of a record, by the rules of the common law; and all the effect, as evidence of the authenticity and validity of the act, which the parliament rolls of statutes had in England." And again, "it must of necessity have been intended that the act so sanctioned, and required to be preserved, shall constitute a record, with the incidents, appertaining to such a record at common law, importing absolute verity which no evidence is allowed to contradict, and a compliance with all the forms necessary to its validity." Having established the proposition that the act thus authenticated and preserved, is a record, and upon settled principles of evidence, incapable of contradiction, the court go on to rule, that if this were not so, yet this court cannot take judicial notice of the journals of the legislature in order to ascertain the true state of facts.

3. In the third place, it is insisted that the resolution if otherwise valid, would be void as impairing the obligation of the contract between the State and the relator, and taking away his vested rights.

To determine this question correctly it is necessary to understand precisely what it is that the legislature has undertaken to do. Before the passage of the resolution of October 25, 1865, it was made the duty of the auditor to examine, state, settle, and audit, all accounts, claims and demands against the State, arising under any act or resolution of the legislature (putting acts and resolutions on the same footing as laws), and to grant to

Swann *v.* Buck.

any claimant authorized to receive the same, a warrant, etc. This was a regulation, not especially for the benefit of the claimants, but a part of a system for the safe-keeping and disbursement of the public money, providing a check upon the disbursing officers, and securing accuracy and correctness in their accounts. This provision the legislature proposed to repeal, and to suspend entirely the issuance of warrants, until time was allowed to consider the condition of the public treasury, and to establish a policy to be pursued thereafter. It was clearly within the ordinary and legitimate powers of the legislature to adopt this repealing act, unless some right had vested under some contract of the State, that would be impaired by such repeal, and in that event the law would only be invalid to the extent of the rights injuriously affected. But if void as to any one person, it is equally void as to all persons having claims against the State at the time of its adoption.

This resolution does not propose to interfere in any way with the right of the relator to receive his salary for the time he discharged the duties of his office. Such right is not denied, or impaired. It remains the same that it was before the resolution was adopted. But it is said the resolution takes away the remedy of the officer to obtain payment of the amount due him. It seems to us, however, that the duty imposed by law on the auditor to issue warrants on the treasury, in favor of certain public creditors, is in no proper sense a remedy given to such creditor. Certainly it is not a *legal* remedy. It was no doubt designed to provide the mode of making prompt payment to the creditor, but the particular forms adopted were not so much intended to furnish him a remedy, as to secure the safety of the public treasury, and the due control and accountability of the officers charged with its custody. They are a matter of public policy for the protection of the public money, rather than a means for the vindication of private rights. It is surely competent for the legislature at any time to change any regulations in force relative to the collection, safe-keeping, and disbursement of its funds; to abolish existing systems altogether; and to substitute such new ones as experience may recommend.

The idea that the creditors of the State have such a vested interest in the existing mode of administering the public treasury, that such regulations cannot be changed, and new or additional safeguards thrown around the subject, without thereby impairing the obligation of the contracts between the State and its citizens, is rather startling, and cannot be adopted without the most imperative necessity.

The State cannot be sued at law, and therefore the idea of legal liability cannot be predicated of its executory undertakings. The very notion of a contract, the obligation of which admits of being impaired by legislation, carries with it the condition of a liability to some legal remedy for its enforcement. States are bound by every consideration of conscience and good faith to perform their contracts, but they cannot be compelled to perform them. The only remedy for a debt due by a State, is by an application to the legislature to make an appropriation for its payment. Indeed, no money can be drawn from the treasury, but in consequence of such an appropriation. It is undoubtedly competent for the legislature, as it has usually done, to pass general and permanent appropriations for particular purposes, as for the payment of the salaries of officers, the support of public institutions, and the like, and to direct the manner in which such money shall be drawn; and it seems equally competent for the same body, at any time, to repeal or modify such general laws. So far as the article quoted from the code might be construed to authorize the issuance of a warrant, in a case where no appropriation had been made for its payment, it would itself be unconstitutional.

Regarding the issuance of a warrant, for the sake of the argument, as a remedy to the creditor, it has recently been solemnly decided by this court in the case of *Coffman* v. *The Bank of Kentucky*, that the remedy does not enter into, or form any part of a contract, but remains subject to the control of the legislature, subject only to the condition that in dealing with the remedy, the substantial right of the party shall not be destroyed, or diminished, by the denial of any remedy whatever. Now the only remedy that exists for the collection of demands

against the State, in ordinary cases, is by and through the action of the legislative department, and this remedy remains wholly unaffected, and may be resorted to by the party at his pleasure. In the case of contracts made by individuals, there is always a legal obligation, and a legal remedy in some form for its enforcement; and it is the action of the legislature upon these remedies, that has usually given rise to the discussions in our courts of justice, whether the obligation of the contract has been impaired. A legal remedy is a suit or proceeding in a court of justice. The grants, and executed contracts of a State, are contracts within the protection of the constitution. But its executory contracts, such as promises to pay money, and the like, have no other than a moral sanction, and depend upon good faith for their performance. No money can be drawn without an appropriation, and no court can compel the legislative department to pass a law to make one. There being, therefore, no legal remedy to enforce a contract against the State, the act forbidding the auditor to issue warrants does not impair, or in any manner interfere with any legal remedy which the party possessed.

Our constitution does provide that "the legislature shall direct by law in what manner, and in what courts, suits shall be brought against the State" (article 7, section 10). This requirement was executed, in 1833, by directing such suits to be brought in the Superior Court of Chancery. That court, however, was abolished several years ago, and no new regulation has been made on the subject. But if there had been such a law in force when the claim of the relator accrued, the power of the legislature to repeal it, could hardly be denied. In *Darrington* v. *State Bank of Alabama*, 13 Howard U. S. 12, Justice McLean, delivering the opinion of the court, says: "The fact that the State of Alabama may be sued by one of its own citizens, does not alter the case; such law may be repealed at pleasure; and if judgment could be obtained, the payment of it could not be enforced."

But this question may be rested upon broader grounds. It may be premised that a State can no more pass a law impairing the obligation of its own contracts than the contracts between

its citizens; and that a state convention, assembled to frame ·or modify its fundamental law, possesses no more power, in this respect, than the legislature.   The prohibition is upon the State itself.   No State can pass any such law, no matter what form it may assume for the purpose.   But it may be quite confidently denied that there is any contract in the case, or that any public officer holds his office, or receives his compensation, under or by virtue of any contract with the State, within the purview of the constitution.

In the case of the *Dartmouth College* v. *Woodward*, 4 Wheaton, 627, Chief-Justice Marshall, discussing the question whether the contract in that case was protected by the constitution of the United States, says: " On the first point, it has been argued that the word ' contract,' in its broadest sense, would com-- prehend the political relations between the government and its citizens, would extend to officers held within a State for State purposes, and to many of those laws concerning civils institu- tions, which must change with circumstances, and be modified by ordinary legislation : which deeply concern the public, and which, to preserve good government, the public judgment must control."   " Taken in its broad and unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a State ; would unnecessarily and unwisely embarrass its legislation, and render immutable those civil insti- tutions that are established for purposes of internal govern- ment, and which, to subserve those purposes, ought to vary with varying circumstances;" and he remarks " that the framers of the constitution did not intend to restrain the State in the regu- lation of their civil institutions, and that the instrument they have given us is not to be so construed, may be admitted.   The provision of the constitution never has been understood to em- brace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice."

This language of Chief-Justice Marshall is quoted and adopted by this court in the case of the *State* v. *Smedes & Marshall*, 26 Miss. 47, in which case the judge delivering the opinion goes on

to say : " The court throughout the whole opinion recognize the distinction between the character of contracts protected by the constitution, and those which in one sense exist between the State and her officers. The latter have never been held or thought to receive any protection whatever from the constitutional provision. They are not, in either a technical or ordinary sense, contracts. In all contracts, there must be mutuality,— both parties must be bound. They can only be dissolved, discharged, or performance dispensed with, by their terms, or by consent of parties. If officers were placed in this situation, it would be difficult to see how they could resign their offices, when they desired to relinquish public trusts. The proposition is so plain, that it appears to be only necessary to state it, to show that an officer's salary, or compensation, is not of the description of contracts, the protection of which is provided for in the constitution."

Offices in this country are not incorporeal hereditaments, nor are they the subjects of property. They are not held by grant; nor does the tenure partake of the quality or character of contract, the obligation of which cannot be impaired by legislation. They are mere agencies of a political nature, created for the discharge of public duties in the administration of government, and which the government may regulate for the general good. So far from holding a proprietary interest in their offices, the incumbents are but naked assents, without an interest. There is no contract, express or implied, between a public officer and the government whose agent he is. The latter enters into no agreement that he shall receive any particular compensation for the time he shall hold the office, nor that the office itself shall continue for any definite period. Where the constitution creates the office, or limits the tenure, or fixes the compensation, these things are beyond legislative control; but that makes no contract. The people, in their sovereign capacity, may by a new constitution terminate the office, without regard to the rights, the interest, or the expectations of the incumbent. So an office created by law may be repealed by law, without reference to the term, or future salary of the officer. The same

sovereign power which prescribes the duties of the office may alter them at pleasure. It may increase the duties without enhancing the compensation, or it may diminish the compensation without lessening the duties.

On the part of the officer, there is still less in the nature of a contract. Whether he holds under a constitution or a statute, he is under no obligation to continue the discharge of his duties for a single day. He may resign at any time, and no power of the government can prevent him.

His right to compensation grows out of the fact of the rendition of the services, and he is entitled to it merely because the law gives it to him, and not on account of any contract between the government and himself, that the services shall be rendered by him.

It is sufficient merely to refer to a few of the numerous adjudged cases in which all these principles will be found to be fully sanctioned, and which indeed flow as logical deductions from the ruling of Chief-Justice Marshall in the case already quoted.

*Conner* v. *City of New York*, 2 Sandf. 355; same case, 1 Seldon, 285; *The State* v. *Dews*, R. M. Charlton, 397; *Haynes* v. *The State*, 3 Humphries, 480; *Commonwealth* v. *Bacon*, 6 Serg. & R. 322; 4 Penn. State R. 49; *Beuford* v. *Gibson*, 15 Ala. 521; *Coffin* v. *The State*, 7 Indiana (Porter), 157.

Most of these cases involved only the right to alter and increase the duties, or to diminish prospectively the compensation of officers; but they show clearly that the rights of such officer are not held by contract, and are not within the protection of the constitutional provision on that subject. In the case of the *U. States* v. *Heth*, 3 Cranch, 399, the Supreme Court seem to admit that the compensation of a public officer may be reduced retrospectively, for they put their decision in that case on the ground, that the intent was not manifest to give the act of Congress a retroactive effect.

The conclusion we have reached on this point is in harmony with other considerations bearing upon it. Every State is bound to the strictest observance of good faith towards the

public creditor, but it is not always that States, any more than individuals, are able at once to liquidate all their obligations. It is not to be supposed that they will ever fail to do whatever justice requires, but they must determine for themselves the extent of their capacity, and the mode of applying their resources. It is essential to the very existence of the State, that the taxing power should control the expenditures. The legislature must of necessity hold the key of the treasury, and must decide to what objects the revenue should be devoted. Its first duty is to provide for the support of its own government, and to apportion public burdens according to the condition and circumstances of the people. If necessary to postpone the payment of any portion of the public debt, it must determine which shall be first paid.

4. In the fourth place it is contended that the resolution in question did not take effect until after the judgment in favor of the relator was rendered, and therefore cannot apply to it.

The judgment in the court below was rendered on the 7th day of December, 1865, and the resolution was approved on the 25th of October. The constitution provides that, " no laws of a general nature, unless otherwise provided for, shall be enforced until sixty days after the passage thereof." (Article 7, section 6, Rev. Code, 35.) This resolution, if it takes effect at all, must be regarded as a " law," and as a law " of a general nature," for it is a regulation of a public office, in which the whole people are interested. It speaks in the present tense, and so far indicates an intention that it should go in force immediately. The object it has in view would also lead to the same conclusion. But it is precisely to such cases that the constitutional restriction ordinarily applies. If expressed in the future tense it would carry with it its own limitation. The effect of the clause appears to be, that laws in the present tense, which, without some such restriction would go into effect immediately, by force of the general language employed, shall not be enforced until after sixty days from their passage, unless a contrary provision is made. It is not necessary, however, that

this provision shall be made in express affirmative words, nor that it shall be contained in the same act. It is sufficient if the intention of the legislature is clearly manifested in some other manner than by the general phraseology of the act or resolution itself. Let us see then whether the legislature has made any provision as to the time when this resolution should be enforced.

As one part of a statute is properly called in to help the construction of another part, and is fitly so expounded as to support and give effect, if possible, to the whole, so is the comparison of one law with other laws made by the same legislator, or upon the same subject, or relating expressly to the same point, enjoined for the same reason, and attended with a like advantage. In applying the maxims of interpretation, the object is throughout, first to ascertain, and next to carry into effect, the intentions of the framer. It is to be inferred that a code of statutes relating to one subject, was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions. It is therefore an established rule of law, that all acts *in pari materia* are to be taken together, as if they were one law, and they are directed to be compared in the construction of statutes, because they are considered as framed upon one system, and having one object in view. Dwarris on Statutes, 699.

It is necessary, therefore, to a proper understanding of the intention of the legislature, that we should look at all the acts passed at the same session, in relation to this subject. These were indeed quite numerous, but a reference to three joint resolutions and two bills will give us a sufficiently comprehensive view of the subject, and enable us to understand the policy adopted. It is to be premised that when the legislature assembled on the 16th day of October, 1865, the State was under the federal military rule, its civil government had been totally subverted, and that there was not a dollar in the treasury, nor any possibility of collecting revenue without considerable delay. The provisional governor had, however, collected a considerable amount above the wants of his administration, which he was

willing to turn over to the new State authorities.    Under these circumstances, the legislature adopted a joint resolution, which was approved October 21, 1865, to the following purport, to wit:

"Sec. 1. *Be it resolved*, etc., That the treasurer be, and he is hereby authorized, to receive from the provisional government of the State, any public moneys that may be remaining in the treasury of said government.

"Sec. 2. That the said public moneys shall remain subject to such appropriations as may be made by this legislature.

"Sec. 3. That the treasurer shall file his receipt therefor with the auditor of public accounts, or a duplicate thereof."

It will be observed that this resolution is obnoxious to all the criticism that is urged against the validity of the resolution which is brought especially under examination in this cause. It lacked the enacting clause directed by the constitution, and it contained no provision for being enforced within sixty days. Nevertheless it was acted upon immediately; the money was received into the treasury, and the legislature proceeded, during the session, to make appropriations, several of them by joint resolution, payable out of this fund, which, as is seen above, was placed exclusively under the control of that legislature.    As soon as this fund was received into the treasury, the legislature passed the joint resolution now in question, in the words already quoted, " That the auditor of public accounts be, and he is hereby directed to issue no more warrants upon the treasurer for the payment of money, until further orders."    This was approved on the 25th of October, and was shortly followed by another resolution, approved October 31st, 1865, to this effect, to wit: " That the treasurer be, and he is hereby ordered not to pay out any moneys now remaining, or that may hereafter be received, in the treasury of the State, unless especially ordered by the legislature, until further orders."    Having thus undertaken to repeal all existing laws empowering the auditor to issue warrants, and authorizing the treasurer to pay them, the legislature proceeded to define the powers and duties of these officers in the future.    By act approved December 2, 1865 (omitted in the

published laws), it was inserted "That the treasurer be and he is hereby authorized to pay all auditor's warrants issued by authority of the legislature, and all appropriations passed at the present session; and also all salaries of State and District officers and other claims, accruing since the 16th day of October, 1865, out of any moneys in the treasury not otherwise appropriated." It was also provided, by act approved December 4, 1865, " That the auditor of public accounts be, and he is hereby authorized to issue his warrants on the treasurer for all legal claims against the State accruing from the sixteenth day of October, 1865." Both these latter acts contain a second section, declaring "that this act shall take effect and be in force from and after its passage."

All this action of the legislature being on the same subject, and having but one object, is to be construed together, and regarded as forming but one law. It is plain that the two acts last named are based on the assumption that all authority to issue and pay warrants had been repealed, and they restore that authority to the extent that it is intended to be afterwards exercised. They recognize the previous resolutions as having already taken effect, and they amount, themselves, to a provision that the resolutions shall take effect, at least, from the date of the passage of these acts. Upon the hypothesis that the previous law contained in the code remained in force, these acts were wholly unnecessary and useless; for full authority in that case would have been already in existence, for the issuance and payment of warrants for all claims, whether accruing before or after the sixteenth of October. If the resolutions do not take effect from their passage, we will have the anomaly of two acts of the legislature, founded upon the resolutions, and designed to supply a defect in the law occasioned by their passage, actually taking effect three or four weeks in advance of the resolutions themselves. To avoid such a result, which could never have been contemplated by the legislature, we are justified in holding that these acts adopted and gave effect to the resolutions, at least from the date when they took effect. And we have the best authority for such a conclusion. In the

case of the *West Feliciana Railroad Co.* v. *Johnson,* 5 Howard, 273, there was an original act containing no provision as to the time when it should take effect, and a supplement passed at the same session containing a clause that the supplemental act should take effect from its passage. This court in deciding the case said, " The act relied on in the plea, made no provision as to the time when it should take effect, and would, therefore, under the constitution of the State, have no operation until the expiration of sixty days from its passage. But the supplemental act of the same session, provides that the same shall take effect immediately. And, though the terms of the provision are confined to the amended or supplemental law, it must extend back and embrace the original act, or the strange anomaly would exist of an amendment made to a law at the same session, going into operation before the law to which it refers, and with which it is connected. It stands on the same ground in this respect, as if the supplemental law had been incorporated with the original law during its passage, by the ordinary mode of amendment." This authority is directly in point, and is conclusive of the question.

As the joint resolution of the 25th of October must, therefore, be held to have taken effect before the rendition of the relator's judgment, and repealed the law authorizing the issuance of a warrant to the relator; and as the act of December 4th only restored the right in cases of claims accruing after October 16, 1865, it would follow that the judgment was in this respect erroneous.

The joint resolution of October 25 is the only legislative act expressly relied on in the return of the appellant, as a ground of his refusal to issue warrant demanded. But that resolution may be laid wholly out of the question without affecting the result. It may, for all the purposes of the cause, be considered as never having been passed at all, and the decision can be safely rested entirely upon the act of December 4, already quoted. That act expressly authorizes the auditor to issue warrants for all claims accruing after the 16th of October, 1865. But, in the view we are now taking, there was already a law in

full force providing for the issuance of warrants for all claims, whether accruing before or after that date, and therefore no necessity existed for such an act, if only intended to sanction the issuance of such warrants. Something else, therefore, was intended, and the evident purpose of the legislature was to prohibit the issuance of warrants in any case not embraced within it. The intent being ascertained, it must be carried into effect, if warranted by the words of the act. It is true there are no negative words, nor any express repealing clause, and that repeals by implication are not favored by the courts; yet it is a well-settled rule of interpretation, that although the subsequent statute be not repugnant in all its provisions to a prior one, yet, if the later statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act. Sedgwick on Stat. and Const. Law, 124; *Davies v. Fairbairn*, 3 How. U. S. R. 636; *Dexter and Limerick Plank Road Co.* v. *Allen*, 16 Barbour, 15. The application of this principle to the present case is plain, for it is clear that the legislature intended this act of December 4, 1865, to prescribe the only rule that, for the present, should govern in the issuance of warrants by the auditor.

This act being passed, and taking effect before the judgment in favor of the relator, took away the only foundation on which that judgment could stand. *Rey* v. *Goodwin*, 4 Moore & Payne, 341; *Butler* v. *Palmer*, 1 Hill N. Y. 324; Smith on Const. and Stat. Law, 889.

The policy of the legislation under discussion is a matter with which this court has but little concern, yet it may not be altogether impertinent to allude briefly to the circumstances under which it was adopted.

The legislature met after the close of four years of exhausting and disastrous war. During its progress the people had cheerfully submitted to the greatest sacrifices, and had contributed, in taxes and voluntary offerings, enormous sums in money and property for the support of the cause. Production had been to a great degree suspended. The country had been ravaged in every direction, towns had been sacked and burned,

dwellings pillaged and destroyed, stock killed or driven away, farming implements broken up, fences torn down and consumed, and the whole land as far as possible reduced to desolation and ruin. At the close of the contest, the labor system upon which all our prosperity had been reared, was abolished. Probably one thousand millions of dollars would not much exceed the loss of property of all kinds, sustained by the people of Mississippi alone. During the conflict, the State had strained its resources to the utmost. Large sums had been collected in funds which, though depreciated, were yet the common currency of the whole people, and ample provision was thus made for the liquidation of all demands against it. When the contest closed, a large amount of this currency was in the treasury, and the proper offices all over the State were actively engaged in the collection of another heavy tax. By the unfavorable issue of the war all these funds became instantly worthless. The State Government being subverted, no new revenue system could be provided; and when the legislature assembled on the 16th of October, 1865, there was not one dollar in the treasury. A small sum of money, sufficient only to defray the expenses of the government for a few weeks, was paid into the treasury by the provisional governor. It was impossible promptly to provide an adequate revenue, and the wide-spread destitution and distress that prevailed among the people, peremptorily forbade the imposition of heavy taxes.

Under these circumstances, amid the doubt and uncertainty that rested upon the future, it is not at all surprising that the legislature should have determined to postpone the liquidation of the preëxisting debts of the State to a more propitious period, and for the present to attempt no more than the collection of a sufficient amount of revenue to defray the necessary current expenses of the government. In doing so, it seems difficult to deny that the legislature exercised its legitimate powers in a wise and beneficial manner.

As regards the right of the civil officers exercising their function in those portions of the State not in the permanent occupation of the army of the United States, to receive their salaries for

the time anterior to such occupation, we can entertain no doubt. The State of Mississippi is to-day the same State that occupied its limits before the 9th day of January, 1861, and since that date. Its constitution and its laws are the same, except so far as they have been altered, from time to time, by its own act. Rights of property are to be governed, contracts are to be construed, and crimes are to be tried and punished, by the same laws that existed before the date of the act of secession, or that have been enacted by the legislature since. It is not a new State, or a new government; but the same State and the same government. The military commanders have not assumed to alter our laws, nor abolish them, but have only changed the administration of them, by substituting new functionaries, chosen by ourselves, under forms prescribed by them. During the period of transition, while the State was held under the military rule, our general system of laws, civil and criminal, was not attempted to be abolished or suspended, except so far as those laws conflicted with the exercise of the military power, or with the regulations ordained expressly or impliedly by its authority, or with the constitution, laws, or policy of the United States; but only their execution was suspended for want of the proper magistracy to enforce them. The State is not relieved of its debts by the revolution through which it has passed, and the salaries due to its officers, for the period during the war, while they were in the discharge of their functions, stand upon no less favorable footing than other debts due before the war commenced, or lawfully contracted since. But it is for the legisture to make such provisions for the discharge of these, and all other obligations that rest upon it, as they may deem wise and proper.

In view of the whole case, the judgment of the court below will be reversed, and the petition of the relator dismissed, at his costs in both courts.