S. P. GIBBONS ET AL. *v.* D. E. BRITTENUM ET AL.

1. STATUTES. *Repeal by implication.*

Although repeals in law are not favored, yet every affirmative statute is a repeal by implication of a precedent affirmative statute, so far as it is in conflict therewith, even though there be no repealing or negative words in the statute last adopted.

2. SAME. *Repeal by implication.*

It is a well-settled rule of construction that a subsequent statute, although not repugnant in all its provisions to a prior one, if clearly intended to prescribe the only rule that shall govern in the case provided for by it, repeals the original statute.

3. CODE 1871. *Provision as to widow of childless husband.*

By sects. 1948, 1949, and 1951 of the Code of 1871, approved 13th of April, the brothers and sisters of a childless decedent take the whole of his estate, subject to dower in the land. By sect. 1786, the husband takes all the property of a deceased childless wife; and by sect. 1788, the widow takes all the property of a deceased childless husband. These sections were approved the 17th of April. By sects. 1281 and 1282, approved the 13th of May, the widow takes as dower, in fee-simple, half the estate of her deceased childless husband.

Chap. 1 of the Code, adopted the 12th of May, declares that all the chapters therein contained shall constitute the Code, and take effect on the 1st of October. *Held*, that sect. 1778, so far as it gives the whole of a childless intestate's estate to his widow, is in conflict with sects. 1281 and 1282, approved subsequently, and is repealed by them. CAMPBELL, J., dissented.

4. CODE. *Conflicting provisions. How construed.*

Differences of time are to be disregarded in construing apparently conflicting provisions of the Code, if by disregarding them, and looking at the work as a whole, harmony can be thereby produced. But if, after exhausting every scheme of reconciliation, there remains a palpable and irrepressible conflict in the provisions of the Code, the court is compelled, in the absence of any thing else indicative of the legislative will, to determine it, to adopt the latest declaration thereof. CAMPBELL, J., dissented.

5. SAME. *Conflicting provisions construed.*

The Code is to be regarded as a whole, established *uno flatu;* and in order to harmonize apparently conflicting provisions, the court will look through the entire work, and gather such assistance as may be afforded by a complete survey of it. Its many sections are to beheld as parts of a single statute, which must be made to harmonize, if possible; but if there be an irreconcilable conflict in its parts the section last adopted must prevail. CAMPBELL, J., dissented.

6. SAME. *Sects. 1788 and 1281 partially harmonized.*

Sects. 1788 and 1281 of the Code can be reconciled in certain circumstances, and then both should be retained. Under the former, a widow takes dower in a reversion or remainder, but not under the latter; under the latter, she would take dower in the lands of the husband conveyed otherwise than in good faith and for valuable consideration, which could not be done under the former. Other provisions of these sections are in conflict.

APPEAL from the Chancery Court of Marshall County.

Hon. A. B. FLY, Chancellor.

The only question presented by the record in this case is, whether the property of a husband dying without children, or descendants of children, after the Code of 1871 took effect, but prior to the statute of April 15, 1876, upon this subject, should go wholly to the widow, to the exclusion of the brothers and sisters of the decedent, or whether she should only take one half, and they the other half, of the estate. The chancellor decided that the widow was entitled to the whole estate. The statutory provisions relating to this question are sufficiently set forth in the opinions of the judges.

*Featherston & Harris,* for the appellants.

1. There is an irreconcilable conflict between sects. 1281

and 1282 of the Code of 1871, and sect. 1788 of the same Code.  Shall the former or the latter be enforced?  This question is settled by the rule of construction, that the last law enacted repeals a former one upon the same subject, when they are in conflict.  If two statutes, passed on the same day, are repugnant to each other, the latter will repeal the former. And the latter part of a statute, or clause thereof, will repeal the former part, or clause, if there be a conflict between them. Sedgw. on Stat. & Const. Law, 415 ; Bac. Abr., tit. " Statutes," D ; *Nazareth Benevolent Inst.* v. *The Commonwealth*, 14 B. Mon. 266 ; *Parker* v. *Sunbury & Erie R. Co.*, 7 Har. (Pa.) 211 ; *Pease* v. *Whitney*, 5 Mass. 380.  Sect. 1788 of the Code was approved on the 17th of April, 1871, and on the 13th of May thereafter, sects. 1281 and 1282 were approved.

2. The fact that all the sections of the Code went into effect on the same day cannot affect the application of the rule of construction above announced.  The inquiry is as to the time when the legislative will was expressed, regardless of the time when the statutes were to take effect.

3. Sects. 1281 and 1282 are in harmony with the past legislation of the State.  Code 1857, p. 453, art. 110 ; How. & Hutch. Code, p. 393, sect. 31, p. 394, sect. 33, p. 351, sect. 41, p. 352, sect. 42, p. 367, sect. 97 ; Hutch. Code, p. 623, sect. 50, p. 624, sect. 52.  Whether these different statutes are in force or not, they are *in pari materia,* and are to be considered.  Sedgw. on Stat. & Const. Law, 247 ; *Scott* v. *Searles*, 5 Smed. & M. 25 ; *Grand Gulf R. Co.* v. *Archer*, 8 Smed. & M. 151 ; *Dixon* v. *Doe*, 1 Smed. & M. 70 ; *Shelton* v. *Baldwin*, 4 Cush. 439.

4. The act of 1876 declares sects. 1281 and 1282 to be in force, and repeals them in express language, and establishes sect. 1788 as the law.  This act shows that, in the judgment of the Legislature, sect. 1788 had not been in force prior to the passage of said act.

5. Sects. 1281 and 1282 are found in chap. 9 of the Code,

entitled, "An act in relation to Chancery Courts." They are in their right place, as Chancery Courts wind up estates, and determine, in all cases, the share to which the widow is entitled. And in 1876, when the Legislature changed the law, the new provision was put in chap. 91, entitled, "An act regulating the pleadings and practice of Chancery Courts." Sect. 1788 forms a part of chap. 23 of the Code, which contains a medley of provisions, and is not an appropriate place for such section.

6. Although there may not be an irreconcilable conflict between the sections above referred to, if it be manifest that the Legislature intended sects. 1281 and 1282 as the rule of law on this subject, they will operate as a repeal of sect. 1788. Sedgw. on Stat. & Const. Law, 124; *Swan* v. *Buck,* 40 Miss. 304, 308.

*Manning, Watson & Moore,* on the same side.

1. Sect. 1281 of the Code of 1871, in so far as it fixes the right of a widow in the estate of a deceased childless husband, was intended as a substitute for sect. 1788, and repealed it. There can be no doubt that sect. 1281 is the last expression of the legislative will upon this subject. After sect. 1788 had been approved by the governor, sect. 1281 was reported to the House by its Judiciary Committee, and thereafter passed. The power of the Legislature to repeal sect. 1788 by sect. 1281 is clear. *Attorney-General* v. *Brown,* 1 Wis. 313; *Mobile & Charleston R. Co.* v. *The State,* 29 Ala. 573; *Spencer* v. *The State,* 5 Ind. 41; *Bank of Tennessee* v. *Black,* 11 Smed. & M. 434. One section in a Code may be repealed by another section therein. *Ham* v. *The State,* 7 Blackf. 314; *Johnson* v. *Byrd,* 1 Hemp. 434; *Byrne* v. *Stewart,* 3 Desau. 135, 143.

2. The act of 1876 amended sect. 1281 so as to give the widow all of the real estate of a childless intestate. The law must be construed so as to show the impress of this amendment. In order to do this, sect. 1281 must be con-

strued as limiting the estate of the widow to one-half of such intestate's land; and the amendment is a legislative recognition that the section had such effect. A declaratory statute cannot be in the shape of an amendment.

3. The following authorities are conclusive, in addition to those already cited, that sects. 1281 and 1282 must be construed as intended for a substitute for sect. 1788: *Swann* v. *Buck*, 40 Miss. 268; *Pierpont* v. *Crouch*, 10 Cal. 315; *Sacramento* v. *Bird*, 15 Cal. 294; *The State* v. *Conkling*, 19 Cal. 501; *Storman* v. *The State*, 21 Texas, 734; 12 Ashm. 176; *Johnson's Case*, 33 Pa. St. 511, 515; *Commissioners* v. *Potts*, 10 Ind. 286; 48 Ind. 60–64; *The State* v. *Rogers*, 10 Vt. 319.

4. Sect. 1281 is inconsistent with sect. 1788, and they cannot both stand. To reconcile two statutes, effect must be given to both. Sect. 1281 gives the widow one half; sect. 1788 gives the widow two halves. To give effect to both, the widow must take three halves. The question is, Which statute shall prevail? and this is answered by the authorities. "An affirmative as well as a negative statute will repeal a former law, without express words for that purpose, if in substance it be inconsistent with the former law." *Adams* v. *Ashby*, 2 Bibb. 96; 4 Wash. 691; 5 McLean, 178; 102 Mass. 386, 389; 43 Cal. 561; 8 Iowa, 394; 8 N. J. L. 48; Harp. 101; 28 Ga. 85.

5. As to what is "dower," we cite Bouv. L. Dic. 505; 4 Kent's Comm. 32; 2 Cooley's Bla. 128; Code 1871, sect. 1287.

*Howard Falconer*, on the same side.

1. The estate given the widow by sect. 1788 of the Code is as clearly a "dower" as that given by sect. 1281. Dower is defined to be "the portion which a widow hath of the lands of her husband, after his decease, for the sustenance of herself and education of her children." Jacob's L. Dic., tit. "Dower."

2. The Legislature, by the act of 1876, held sects. 1281

and 1282 to be in force at that time. For the reason of this amendment, see *Bank* v. *Black*, 11 Smed & M. 43; *Bank* v. *Collector, etc.*, 3 Wall. 495.

*W. S. Featherston* and *E. M. Watson*, of counsel for the appellants, argued the case orally.

*Walter & Walter, William M. Strickland*, and *Lawrence Johnson*, for the appellees.

1. There is no real, but only an apparent, conflict between sects. 1281 and 1788 of the Code. The former treats only of dower; the latter, of husband and wife, and the rights of married women. We have three chapters in our Code treating of decedents' property, viz., chaps. 9, 23, and 35. Sect. 1281, of chap. 9, treats of dower; sects. 1786 and 1788, of chap. 23, treat of the rights of husband and wife; and sect. 1948, of chap. 35, treats of descents. Each chapter must be read as to its special subject-matter. Each is perfect as to that subject-matter. As to the rule that statutes shall be read with reference to similar statutes, and with reference to the subject-matter of each, the authorities are numerous and uniform. Sedgw. on Stat. Law, 422, 423; *Salkeld* v. *Johnson*, 1 Hare, 196; *Henderson* v. *Bise*, 3 Stark. 158; *Wells* v. *Porter*, 2 Bing. N. C. 723; *Ellsworth* v. *Cole*, 2 Mee. & W. 31; 4 Mee. & W. 4; 2 Mee. & W. 46; *Forth* v. *Chapman*, 1 P. Wms. 667; *Sheffield* v. *Lord Orrery*, 3 Atk. 382; *Southby* v. *Stonehouse*, 2 Ves. sr. 611; *Nazareth Benevolent Inst.* v. *The Commonwealth*, 14 B. Mon. 266; 6 Ind. 354; *Dodge* v. *Gridley*, 10 Ohio, 173. On p. 178 of the last case cited, the court say that if two statutes "admit of being applied to different subjects, there is no necessity for supposing an implied repeal." The same doctrine is held in *Martin* v. *O'Brien*, 34 Miss. 21, and in *McIntyre* v. *Ingraham*, 35 Miss. 25.

2. But the appellants insist that sect. 1281, having been approved May 13th, and sect. 1788 April 17th, the former repeals the latter. We deny that any one chapter, or any part of one, of the Code of 1871, is or can be repealed by any other, or any part thereof. The whole was adopted on

the same day, and was to take effect on the same day. The codifiers presented the whole of their labors as a Code. Some chapters were passed on one day, and others on different days. Amendments were made to most of them, but, when all was done, the Legislature adopted the whole as one body of laws, and provided for each and every part to go into effect on the same future day.

3. Conceding, for the argument, that there is some conflict between these statutes, of equal dignity, as to time, we must, if possible, give effect to the provisions of both. The rule is, that all statutes on the same subject are to be construed together, and a harmonious interpretation adopted, if possible, and in consonance with the legislative intent. *Scott* v. *Searles*, 5 Smed & M. 25 ; *Grand Gulf Bank* v. *Archer*, 8 Smed & M. 151 ; *Lessee of Allen* v. *Orris Parish*, 3 Ohio, 193 ; 14 B. Mon. 266 ; 34 Miss. 21 ; 35 Miss. 25. This can be done by construing sect. 1281 as the law of dower, sect. 1788 as the law of descents. But if the conflict cannot be reconciled, we must ascertain the policy of our legislation on the subject. This is seen in art. 16 of the Bill of Rights ; in the enlargement of the rights of the wife by the laws of 1839 and 1846 ; in the Code of 1857 and the Code of 1871 ; also, in House Journal 1871, p. 1001. See also act of 1873 in relation to homestead. We invoke the spirit of our Constitution and legislation. The rule is, that statutes upon subjects recognized by the Constitution, when doubtful, shall be construed in accordance with the spirit of the Constitution, and have a just and equitable construction, consistent with the policy of the State, in preference to one which is contrary to that policy, and makes a rule unjust and inequitable. *French* v. *Teschemaker*, 24 Cal. 518 ; *Duncomb* v. *Prindle*, 12 Iowa, 1 ; *Iowa, etc., Co.* v. *Webster County*, 21 Iowa, 221 ; *Shelton* v. *Baldwin*, 26 Miss. 442 ; *Burr* v. *Dana*, 20 Cal. 20 ; *Ezekiel* v. *Dixon*, 32 Miss. 154 ; *Ingraham* v. *Speed*, 30 Miss. 410 ; *Read* v. *Manning*, 30 Miss. 308 ; *Olive* v. *Walton*, 33 Miss. 103 ; *Barry* v. *Barry*, 15 Kan. 587.

4. A repeal of a statute by implication is never favored, and especially if a harsh and unjust rule would be the result. *Beals* v. *Hale*, 4 How. (U. S.) 37 ; *White* v. *Johnson*, 23 Miss. 68 ; *Fouke* v. *Attorney-General*, 1 Wis. 525 ; *Pease* v. *Whitney*, 5 Mass. 382 ; *McAfee* v. *Southern R. Co.*, 36 Miss. 669 ; *Richardson* v. *Patterson*, 30 Miss. 583 ; *Natchez* v. *Chambers*, 8 Smed. & M. 9. Even conceding, for argument, that sect. 1281 is later in time than sect. 1788, we then invoke the rule that " a later statute, without negative words, shall not take away a former act." Sedgw. on Stat. Law, 123 ; *Gregory's Case*, 4 Co. 19 ; *Brown* v. *Commissioners*, 21 Pa. St. 48 ; *Fosdick* v. *Perrysburg*, 14 Ohio St. 485 ; Dwar. on Stat. 116, 117 ; *Williams* v. *Williams*, 4 Seld. 532.

5. The widow does not take, under sect. 1281, where there is no child or children, as perfect an interest in the one-half of the estate as she takes in the whole, under sect. 1788. Under the latter, she takes by inheritance the whole estate, in fee-simple ; and under the former, one-half in fee-simple, " as her dower." The latter is a dower estate, and would be governed by the laws in reference to dower.

6. Both the codifiers and the Legislature of 1871 intended to provide for cases of intestacy, in sects. 1786 and 1788. Sect. 1281 was taken bodily from the Code of 1857, and the Legislature overlooked the fact that sect. 1281 provided for both testacy and intestacy. Strike out the words " dying intestate," in the first line, and " intestate," in the twentieth line of sect. 1281, and all difficulty is removed.

7. The act of April, 1876, is purely a declaratory statute. *Grisswold* v. *Simmons*, 50 Miss. 123.

*H. W. Walter* and *Frank Johnston*, of counsel for the appellees, argued the case orally.

The judges delivered opinions *seriatim.*

CHALMERS, J.

Under the Code of 1871, unmodified by sect. 25 of the act revising chap. 9 of said Code (Sess. Acts 1876, pp. 178–

194), what interest, if any, do the brothers and sisters of an intestate take in his estate when he leaves no children nor descendants of children, but does leave a widow surviving him?

By sect. 1948 of said Code, it is declared that the whole of the lands and tenements of any person dying intestate, leaving no children, nor descendants of them, shall descend to his brothers and sisters, or, in default of these, to certain other collateral relatives designated. By sect. 1951 the same provision is extended to personal property. By sect. 1949, however, the dower of the widow in the real estate of the husband is preserved in all cases. There is no specification of what that dower shall be. The chapter of the Code in which these provisions are found was approved April 13, 1871. If it constituted the entire law on the subject, it is evident that the brothers and sisters would take the entire estate, save the dower interest of the widow.

By sect. 1788 of the Code, it is declared that if a husband dies intestate, leaving no children, nor descendants of children, his widow shall be entitled to the whole of his estate, real and personal, in fee-simple, after the payment of debts. The chapter containing this section was approved April 17, 1871, — that is to say, four days after the sections giving the entire estate, save the dower, to the brothers and sisters. If these two statutes constituted the whole law on the subject, the brothers and sisters would take the whole estate of a childless intestate where there was no widow, and would, perhaps, take nothing where there was one.

By sects. 1281 and 1282, it is enacted, among other things, that where there are no children, nor descendants of children, of a testator or intestate, the widow shall take as her dower one-half of the estate, real and personal, *in fee-simple*. The chapter containing these clauses was approved May 13, 1871, — just one month after that giving to the brothers and sisters the entire estate, except the dower, and one month, less four days, after that which, by giving the widow all, deprived them of all.

Briefly, then, the law stands thus: By the sections first

adopted, the brothers and sisters get all save the dower; by
those next adopted, the widow gets all; by those last adopted,
the widow gets one-half.  What legal effect is produced by
this?  If these enactments were distinct statutes, passed in
the ordinary course of legislation, it is quite manifest that the
law giving the widow one-half, having been last adopted,
would repeal the one giving her all, and in so doing would
necessarily vest the other half in the brothers and sisters.  In
taking from the widow one-half, it would necessarily, in the
absence of other provisions, confer it upon those who, but for
her, would have taken all.

But these several enactments are not separate and distinct
statutes.  They are parts of a code, the several statutes, chap-
ters, and sections of which, though adopted on different days,
went into operation on the same day, and were intended to
form parts of a symmetrical and harmonious whole.  We
must not treat them as distinct enactments, speaking the will
of the law-giver at different times, but, if practicable, as dec-
larations uttered *uno flatu*, by which was established by a
single utterance the entire statute law of the State.  The
Code, in short, is to be treated as a single statute of many
sections, and, if possible, those sections are to be made har-
monious.  What effect will this view have upon the sections
under consideration?  It will authorize us to look through the
entire work, for the purpose of gathering all the assistance
possible from a complete survey of it.  This is the only aid to
be derived by considering the apparently conflicting sections
as parts of a whole, rather than as statutes *in pari materia*,
adopted at different periods; because, in construing this last
class of statutes, where there are no repealing words in those
last adopted, we are compelled to inspect them all, and, if
possible, make them harmonious.  We are not at liberty to
say that one repeals the other, if it is possible to reconcile
them.  Especially is this so where they are passed at the same
session.  The proper construction of a code differs in no respect

from this, except that we are not limited to the parts which seem analogous, but may look through the entire work. In the present instance this advantage is found to be illusory, because there is nothing in the Code of 1871 which throws any light upon the sections under review. They not only embrace the entire enactments upon the subject of the descent of the estate of a childless intestate, but the book contains nothing outside of them tending to throw any light upon the legislative will in this matter. We return, therefore, to the duty of harmonizing the sections, no more aided by considering them as parts of a code intended to be harmonious than if they were found in two separate acts relating to the same subject, adopted by the same Legislature on different days, with no repealing clause in the one last enacted.

Can the sections be reconciled?

Under certain circumstances they can, and under those circumstances it would be our duty to retain both. Thus, under sect. 1788 a surviving widow would inherit a reversion or remainder to which her husband was entitled, but which he had never enjoyed because of his death before the termination of the particular estate upon which it was dependent. By sect. 1281 the widow would take nothing under such circumstances, because the interest granted by that section is termed a dower, and she would not be entitled to dower where her husband had not been seized.

So, on the other hand, by sect. 1281 she would be entitled to dower in lands sold by the husband, during their marriage, otherwise than in good faith and for a valuable consideration; whereas under sect. 1788 she would inherit only the lands of which he died seized. In these and all similar cases, where one of the clauses can be made to subserve a useful purpose without destroying the other, both should be preserved, and in every case there should be no rejection of either, if there is any possible method of retaining both. Leaving out of view the exceptional cases referred to, growing out of the peculiar ten-

ure by which the estate was held by the husband, or out of the fact of a voluntary alienation by him, can the sections be harmonized where these peculiar features do not exist?

. Let us examine the several methods of reconciliation which have been suggested : —

1. It is said that harmony can be preserved by holding that those sections which give the brothers and sisters the entire estate are intended to apply only where there is no widow, and the others where there is one. The effect of this, it is said, will be to cut off the brothers and sisters altogether where there is a widow, and thus the apparent conflict between the sections giving her all and those giving her half will be immaterial, since in taking all she necessarily takes the half. Thus, one section will absorb the other, and all the sections will have operation, — those which give the entire estate to the brothers and sisters controlling where there is no widow, and the others conferring upon the widow, where there is one, both the whole and the half.

There are several fundamental objections to this theory. In the first place, it is not a reconciliation of the sections at all, but a simple absorption or destruction of one by the other. In the second place, it is not true that sects. 1948–1951, which give the estate to the brothers and sisters, where there are no children, apply only where there is no widow. On the contrary, they plainly contemplate the existence of a widow, and it is provided by sect. 1949, that while the children, or, where there are none, the collaterals, shall take the whole estate of inheritance, the widow's dower shall be preserved under all circumstances, leaving to other portions of the Code to define what that dower shall be. It is not true, therefore, that the rights of collaterals are guarded only where there is no widow.

The further error in this view consists in ignoring the fact that when the law-giver proclaims, in the same breath, " The brothers and sisters shall have all, the widow shall have all, the widow shall have half," the last sentence necessarily implies that the brothers and sisters shall have the half which

is by said sentence omitted. The three sentences can neither be written nor spoken without conveying this meaning ; whether found in a deed, or a will, or a statute, this effect is produced. Let us test this. The Code is one statute with many sections, adopted on different days, but all intended to take effect *in futuro*, on a day named, and to speak a common and harmonious language. This is, *mutatis mutandis*, a good description of a will. Suppose a will, then, couched in these terms : " I give my entire estate to my brothers and sisters. If my wife survives me, I give her my entire estate. If my wife survives me, I give her one-half of my estate." Could such a will be so construed (the wife surviving) as to make it harmonious? Leaving out of view, for the present, the question as to which clause must prevail and which must perish, would it be possible to preserve them all? Would it be admissible to say that the testator intended that the brothers and sisters should take only in the event that the wife did not survive, but that, if she did survive, his intention was that she should take all, because he had said that she was to have both all and half, and the greater included the less?

It has been said that a code speaks *uno flatu*. So does a deed. Suppose, then, a donor places on record, without personal delivery except to the recorder, a deed whereby he conveys his manor of Black Acre to A., and then by another clause conveys it to B., and then by a third clause conveys one-half of it to B. Could these clauses be made harmonious by a construction that gave it all to B.? Would such a construction be a reconciliation of apparently conflicting provisions, or would it be an arbitrary assumption that the testator, or grantor, or law-giver, intended that which we think he ought to have intended?

To hold that the sections can be reconciled by saying that the whole includes the half, and that, therefore, the widow takes all, is to disregard the brothers and sisters altogether. It would be a satisfactory solution if we have in view the widow alone, but it is no solution at all when we remember that others

are standing by who would undoubtedly get all but for her. When we decide upon her rights, we decide theirs also. One clause says, " Give her all ; " another says, " Give her half." One, therefore, says, " Give the brothers and sisters nothing ; " the other says, " Give them half." When sect. 1788 declares that the widow shall have all, it declares also that the brothers and sisters shall have nothing. When sect. 1281 declares that she shall have half, it declares also that they shall have half. Considering them as parts of one statute, they necessarily must be read thus : " If there is no widow, the brothers and sisters shall take the entire estate ; if there is a widow, she shall take the entire estate, and the brothers and sisters nothing ; if there is a widow, she shall take one half of the estate, and the brothers and sisters the other half." This must be the full meaning of the sections, whether we regard them as one statute or as three. As thus written, no possible construction can make them harmonious and preserve them all.

2. But it is said that sect. 1788 gives the widow the entire estate as an heir, or by inheritance, while sects. 1281 and 1282 give her half of it as dower, so that she may claim all by one title or tenure, and half by another. It may well be doubted whether the widow can ever be said to hold by inheritance. Schouler's Domestic Relations, 183, defines dower to be " that provision which the law makes for a widow out of the lands and tenements of her husband ; " and the terms, therefore, would embrace the provision made by sect. 1788, as well as that made by sects. 1281 and 1282. It is to be observed, also, that the word " dower " is not used in sect. 1282, which gives the widow one-half of the personalty. But, apart from this, what possible useful purpose is subserved by the distinction between an estate by inheritance and one as dower, when they are both made estates in fee-simple? By sect. 1788 she takes the whole estate in fee-simple ; by sect. 1281 she takes half of it in fee-simple. Is any thing practical attained by saying that she holds all by inheritance and half as dower? This method of reconciliation is simply cheating ourselves with

sounds at the expense of sense, substituting ideal terms for the substantial reality.

3. But it is said that under sect. 1788 she takes the entire estate, subject to the debts, while under sects. 1281 and 1282 she takes half of it as dower, and consequently freed from all liability to debts. The argument is, that the Legislature intended, in giving her half as dower, to confer a substantial benefit upon her by preserving one-half of the estate in case of indebtedness, and that it would therefore be wrong to so construe this additional provision made for her benefit as to wrest from her the more enlarged provision elsewhere established. This theory seems plausible, and would be sound if not overthrown by other portions of the Code.

As to the personalty, the language of the sections themselves demonstrates its incorrectness. As to the realty, it is shown by other sections. Sect. 1788 gives to the widow the entire estate of the intestate, real and personal, "after the payment of his debts." Sect. 1282 declares, as to the personalty, that "if there be no children, or if there be but one child, in that case, she shall be entitled, out of the residue left after paying the debts of the deceased, to one-half."

It is thus seen that, so far as the personalty is concerned, the antagonism is direct and palpable. Under one section she takes all, after the payment of debts. Under the other, she takes half, after the payment of debts. But there is another important feature to be observed with reference to the personalty, under sect. 1282. It is said that she " shall be entitled *to share in it* as follows : * * * If there be no children * * * she shall be entitled, out of the residue left after paying the debts of the deceased, to one-half." She is "to *share* in it" " if there be no children ;" and her " *share*" is to be " one-half." Who is she to " share" with? Who is to receive, as their " share," the other half, if there be no children? Manifestly those pointed out by sects. 1948–1951, to wit: the brothers and sisters, or other collaterals. Here, then, we have, in sect. 1282, an affirmative declaration that the

widow is to have one half of the personalty, and the collaterals the other half. Nothing is said about " dower," though if we concede that it is meant, so far as the widow is concerned, to be dower, it cannot alter the result, since it is an estate in fee-simple, subject to the debts of the deceased. Under sect. 1788, then, the widow takes the entire personalty in fee-simple after the payment of debts. Under sect. 1282 she takes one-half the personalty in fee-simple, after the payment of debts, and in so doing she " *shares* " with the brothers and sisters, who take the other half in the same way. Certainly no sort of ingenuity can reconcile these sections.

Let us look now to the realty. She takes the entire realty in fee-simple, after the payment of debts, under sect. 1788. She takes one-half the realty in fee-simple, as dower, under sect. 1281; nothing is said about debts. It would seem, then, that here is a substantial difference in the two estates, since it is settled that where the widow takes one-half of her husband's realty in fee-simple as dower, she takes it freed of the debts. *Bridgeforth* v. *Maxwell*, 42 Miss. 743. But by sect. 1283 it is declared, that, if the estate is insolvent, she shall have only one-third of the lands of the intestate; so that another and wholly different arrangement is made with reference to debts. The three sections, then, stand thus : By sect. 1788 she takes all the land, subject to debts; by sect. 1281 she takes half the land, free of debts; by sect. 1283 she takes one-third of the land, if the estate is insolvent. What is meant by the estate being insolvent? It means, of course, so much of the estate as can, in any event, be subjected to the payment of debts, — to wit, all the personalty and two-thirds of the realty. The one-third which the widow is to hold in any event, is not to be taken into account. Now, if the debts equal one-half of the estate, the widow who had taken all the realty under sect. 1788 would devote one half of it to the debts, and retain in fee-simple the other half. But this is exactly what she would do under sect. 1281, where the law gives her one-half only, but gives it to her free from debts ; so that nothing practical is ac-

complished by the attempt to retain the two sections. But suppose the debts exceed one-half the value of the estate, then her one-half of the realty is cut down by as much as is required to pay the debts, until she is reduced to one-third, below which amount the creditors can in no event reduce her, and this result follows whether she claims under sect. 1788 or under sect. 1281. So far as debts are concerned, it is thus perceived that they, in no event, affect the question at issue, — identically the same provision being made for creditors, whether the widow holds under one section or the other. Nothing is gained by the widow, so far as debts are concerned, and nothing lost by creditors, whether we retain the one section or the other. It is only the brothers and sisters, who are totally excluded by one, and who gain half under the other, that are interested in the question. It is only against them that the widow can prefer one section rather than the other.

We have thus exhausted every method of reconciliation which has been suggested, and we have seen that, while in some exceptional states of case all the sections may be retained (and should be), there remains, ordinarily, a direct antagonism which is irreconcilable.

The case before us is exactly of that character. There are here no creditors, or at least none whose rights, in any event, can be affected. There is here no land in which the husband was entitled to a reversion, but of which he was not seized, nor any which he had in his lifetime conveyed otherwise than in good faith, for a valuable consideration.

It is a simple case where a man possessed of a large real and personal estate, free from debts, has died intestate, without children, or descendants of them, but leaving a widow, and also brothers and sisters, surviving him. It is in just this state of case that the Code of 1871 is in a condition of hopeless and irreconcilable conflict. Sect. 1788 or sects. 1281 and 1282 must give way. Which shall fall, and which shall stand?

Upon this question we can have no choice. Compelled to elect between them, we must follow those cardinal canons

of construction which, *proprio vigore*, are embodied in all statutes.

It is not for us to say that it is just and equitable for the widow of a childless husband to take his entire estate, because the surviving husband of a childless wife takes all of hers. From the earliest dawn of the common law, the rights of husband and wife in the estates of each other have been widely different, and no State deriving its jurisprudence from the common law has ever sought to equalize them, so far as we are aware. Neither is it of any value to consider that, nearly five years after the adoption of the sections under consideration, a succeeding Legislature amended the section giving the widow half, so as to make it conform to section 1788 in giving her all.

The intestate in the case at bar died before this change, and our attempt is, not to ascertain the will of the legislators of 1876, but of those who framed the Code of 1871. The fact that the sections giving her half were amended in 1876 must be deemed, of itself, evidence that they were then regarded, by the Legislature at least, as constituting the law on the subject. *Bank* v. *Black*, 11 Smed. & M. 43.

If we can look to the fact that the plan of a code, as presented by the commissioners, contained sect. 1788 and did not contain sects. 1281 and 1282, and that these latter sections were inserted by the Legislature, it would seem our duty to preserve those inserted by the Legislature; since it is easier to believe that they overlooked sect. 1788 than that, of their own motion, they inserted provisions which did not express their meaning.

But the fundamental idea which must control is, that the sections giving the widow one-half were approved one month after that which gave her all. Differences of time are to be disregarded in construing a code, if by disregarding them, and looking at the work as a whole, harmony can thereby be produced; but if this proves impossible, if, after exhausting

every scheme of reconciliation, there still remains a palpable and irrepressible conflict, we are compelled, in the absence of any thing else indicative of the legislative will, to determine it by adopting its latest declaration. Our Code was the work of three commissioners, who necessarily parcelled out the work among themselves, though it is doubtless true that the several parts were carefully compared and attempted to be made harmonious.

It was then submitted to the three judges of this court, who transmitted it, with appropriate suggestions, through the governor, to the Legislature.

By that body its separate chapters were referred to different committees, and after being reported back, were, from day to day, chapter by chapter, adopted by the two houses of the Legislature and approved by the governor. Weeks and months were thus consumed, and many changes made in the original draft. It would be little short of a miracle if a book of three thousand sections, thus produced, did not contain inconsistent provisions. We must suppose that the Legislature was aware of this danger, and that they also knew that if inconsistencies were found which proved irreconcilable, the courts would enforce the sections last adopted and discard the earlier.

There are no repealing or negative words in the sections last adopted; but although repeals in law are not favored, " every affirmative statute is a repeal by implication of a precedent affirmative statute, so far as it is contrary thereto, for "*Leges posteriores priores contrarias abrogant.*"   9 Bac. Abr., tit. " Statutes," D, 226.

" It is a well-settled rule of interpretation that, although the subsequent statute be not repugnant in all its provisions to a prior one, yet if the later statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act." *Swann* v. *Buck*, 40 Miss. 308, and cases there cited.

The sections of the Code giving the widow one-half prescribe

a rule of division of the estate of the intestate different from and repugnant to that which gives her the entire estate, and, being later in date, must repeal it.

So fundamental is the canon of construction which makes the later expression overrule the former one, that it is well settled that the later clauses of the same statute, or of the same will, destroy preceding ones with which they are in conflict. Potter's Dwar. on Stat. 156, note; 9 Bac. Abr., tit. " Statutes," D, 227; *Harrington* v. *Trustees*, 10 Wend. 550.

" If a later clause of a will qualify a preceding one, both can stand; but if the passages cannot be reconciled, the later must prevail, if it is equally relative to the testator's primary intention." O'Hara on Wills, chap. 2, sect. 11.

The same principle is announced in Brown's Legal Maxims (side p. 561), with the qualification that " its application must be restricted by and made subservient to that general principle which requires that the testator's intention shall, if possible, be ascertained and carried into effect."

Undoubtedly the qualification applies to statutes as well as to wills. If a fundamental primary intent on the part of the law-giver can be ascertained from an inspection of all the statutes *in pari materia*, or of all the provisions of a code, and inconsistent provisions are detected, undoubtedly those which tend to promote the general scheme will be preserved, and those which tend to thwart it will be rejected; but this principle of construction is valueless until we have ascertained what was the principal or primary intent. How is it possible to ascertain that here? The matter in hand is the distribution of the estate of a childless intestate. One disposition of it is as proper as the other. There is nothing in the section under consideration, nor in the whole Code, to indicate that the law-giver preferred that the widow should have the entire estate, rather than half of it. In terms equally emphatic he has made both declarations. It is urged, however, that while he has said that the widow shall have all, and that she shall have half, he has not said that the brothers and sisters shall have the

other half; that, therefore, her positive claim to all must not be defeated by their inferential claim to half.

*This is a mistake of fact.*

By sects. 1948–1951 it is distinctly declared that the brothers and sisters, where there are no children, shall have the entire estate, subject, as declared by sect. 1949, to the widow's claim for dower, in all cases; and then, by sects. 1281–1283, her dower is established and defined in every possible state of case. Where there are no children, it is to be one-half, in fee-simple. Most assuredly, therefore, there is a distinct affirmative declaration that the collaterals are to have the other half. That this is so is put beyond the possibility of a peradventure by the fact that the Code of 1857 contained all these sections save sect. 1788, and no man ever doubted, under that Code, that there was a clear affirmative declaration in favor of the collaterals as to one-half the estate where there were no children. The whole trouble is produced by the introduction into the Code of 1871 of sect. 1788. The question is, whether that section shall be disregarded, and an otherwise harmonious system be preserved, or whether it shall be retained, and a half-dozen other sections thrown into confusion. When we reflect that sect. 1788 was the work of the commissioners who prepared the Code, and who purposely omitted the other sections as being inconsistent with it, and that the Legislature, one month after they had adopted that section, deliberately adopted and inserted the other inconsistent section, failing simply to strike out sect. 1788, the conclusion seems irresistible that the system provided by sects. 1281–1283, which harmonizes completely with sects. 1948–1950, and with all other parts of the Code, and is inconsistent only with sect. 1788, is the last and fundamental and authoritative expression of legislative will, and that the failure to strike out sect. 1788 was a mere oversight, proceeding, not from design, but from accident or carelessness.

But the question seems settled upon authority as well as principle.

In South Carolina, Indiana, and Arkansas, it has been held that where inconsistent provisions are found in the different chapters of statutory revisions or codes, intended to take effect and operate as a whole, those last adopted must prevail. *The State* v. *Hall*, 5 Rich. (1873) 120; *Ham* v. *The State*, 7 Blackf. 314; *Johnson* v. *Byrd*, Hemp. 434.

Compelled, as we are, to choose between two sections which cannot be reconciled, we must give effect to the one last adopted, by which one-half only of the estate is given to the widow. Its necessary effect is to give the brothers and sisters the other half.

In conclusion, I would remark that, previous to the investigation of this case, I was of an impression different from that here announced. I recall at least one estate wound up under my advice, while at the bar, in accordance with the theory that the widow took the entire estate. I am now satisfied that I was in error.

Decree reversed and cause remanded, to be proceeded with in accordance with the views here announced.

SIMRALL, C. J.

We encounter, in this case, the dilemma of declaring which of two inconsistent and repugnant provisions of the Code shall prevail. The choice is not to be made on the idea that the members of this court prefer the one to the other, or think the one wiser or better than the other. It is our duty to declare that one as law which was the *will* of the law-maker. To ascertain what that is, the investigation must be conducted according to those canons of construing statutes which have been recognized as safe guides, and are established in our jurisprudence.

When the means of reconciling the conflict have been fruitlessly exhausted, we must consult those rules by whose light it may be satisfactorily determined which shall give way. It is a fundamental rule, and axiomatic, that when two statutes

are inconsistent, the earlier must yield to the later, though there are no express words of repeal.

Where the repugnance is between two sections of the same statute, the last section supersedes the former. *The State* v. *Hall*, 5 Rich. (1873) 120 ; *Powers* v. *Barney*, 5 Blatchf. 203 ; *Elliott* v. *Lochnane*, 1 Kan. 135 ; *Southwark Bank* v. *The Commonwealth*, 26 Penn. 380, 382.

The cases of *Ham* v. *The State*, and *Royston* v. *The State*, 7 Blackf. 314, presented the question of conflict between two statutes passed at the same session. The court said : " In determining which is the law of the land, we know of no other rule of construction than that the last-expressed will of the Legislature must prevail." In *Elliott* v. *Lochnane, ubi supra*, it is said : " This rule of construction is announced in many cases, English and American, and controverted in none." A palpable case of conflict between sections in the same act occurred in *Powers* v. *Barney, ubi supra*. The act of Congress of March 2, 1861, in its nineteenth section, imposed a duty of ten per cent *ad valorem* on Peruvian bark. But in the twenty-second section, Peruvian bark was in the exempt list. Nelson, J., referring to the incongruity, said : " Each party found an authority for his claim in the same act of Congress," and solved the difficulty on the well-settled rule of construction, accepting the last provision as speaking the final intent of the law-maker.

The very question in hand was raised in *Johnson* v. *Byrd*, Hemp. 434. There was an irreconcilable conflict between two sections of the Code of Arkansas. Preference was given by the court to the one last approved. After a careful examination of the Code of Arkansas alluded to, I find that it was matured by the Legislature and adopted in the same manner as our revision in 1871. Each chapter was acted upon and approved separately. Thus, chap. 1, title " Abatement," was approved December 9, 1837. Chap. 2, title " Account," was approved November 29, 1837. In the case cited, a sec-

tion approved December 18, 1837, was held to prevail over an inconsistent section approved the 9th of the same month.

Another rule is, that where two statutes relate to the same subject-matter, though not in terms repugnant, if the later one is intended to prescribe the only rule, it will repeal the former. *Swann* v. *Buck*, 40 Miss. 268 ; *Sacramento* v. *Byrd*, 15 Cal. 294 ; *Davies* v. *Fairbain*, 3 How. (U. S.) 636.

I will now direct attention to the application of these principles, as illustrated in the cases cited, to the conflicting provisions of the Code. We all agree that when the husband dies intestate, without children, or the descendants of them, the Code gives to the widow, surviving, repugnant and inconsistent interests in his estate. In such circumstances, sect. 1788 confers on her the entire estate, real and personal, whereas sects. 1281 and 1282 give to her one-half. Reconciliation on any rational principle of interpretation is impossible. Sect. 1788 is part of chap. 23, which was approved April 17, 1871 ; sects. 1281 and 1282 are parts of chap. 9, approved May 13, 1871. These sections are parts of a series of twelve sections, enacting the rights and interests of the widow and the surviving husband in each other's estates, real and personal. These provisions apply to the various contingencies and conditions stated, both in cases of testacy and intestacy. The subject, in the circumstances therein treated of, was deliberately considered by the Legislature, and the measure of interest which the survivor should take in the property, real and personal, of the deceased is carefully detailed. Sect. 1281 deals with the case of testacy unsatisfactory to the widow, where she has renounced the will, and of intestacy, and determines her interest in the estate, if there be no child or children, nor descendants of them, of the testator or intestate. The next section fixes her rights, in the same circumstances, to the personal estate.

Those sections which give the widow half the estate were adopted nearly a month after sect. 1788, and are the latest expressions of the legislative will, and must prevail, unless

there is something peculiar or exceptional in the Code, which would demand a departure from the general rule.

It is said that the Code was adopted by the Legislature *uno flatu*, and speaks with a simultaneous voice in all of its provisions. That is true in the same sense and to the same extent of any ordinary statute consisting of several sections, enacting the law on a particular subject. The act, as a whole, is put to the vote of the respective houses of the Legislature; if it receives a majority of the voices, it has passed (as we say), and when that fact is certified to the governer, he approves it as a whole, and it becomes law. And yet, if we find a later section in such act repugnant to a former one, the later must be accepted as repealing the former.

A statute is the *will* of the law-making power, in the same sense that a testament is the *will* of a testator. The latest declaration must be accepted as the final intention and purpose.

If we could regard the Code (for the purposes of considering the point) as one statute, and that the mind of the Legislature was expressed in the order in which the several sections are enumerated, then the conclusion would be inevitable that a later section, irreconcilable with a former one, would, by necessary implication, repeal it. But an analysis of the first chapter, providing for its adoption and publication, in connection with the enrolled bills, makes it impossible to apply that rule in its construction. The chapters, as published, are not numbered as they were passed by the Legislature. As adopted, each chapter contained sections numbered from one on, consecutively, to its close. As published, the sections are enumerated from one, consecutively, to the end of the Code. This change in the order of the enactment of the chapters and enumeration of the sections was brought about by the eleventh section of the first chapter, which conferred power on the commissioner who should be designated to supervise the publication of the Code, " to rearrange the chapters by numbers, and to remodel the sections, numbering them

from one, consecutively, through the volume.   *   *   *   He shall omit the enacting and enforcing clauses to all the chapters and sections.''

It is plain that no more was intended by this eleventh section than to intrust to the judgment and discretion of the commissioner the rearrangement of the chapters and sections, without regard to the order of time in which they were severally enacted; and the order in which we may find particular sections placed affords no test or guide of whether one is an earlier or later expression of the legislative will on the subject.

But if there be in the Code, as published, or in the enrolled chapters in the secretary of state's office, other clear and conclusive evidence, proper and competent to be consulted, as to the time when particular conflicting provisions were enacted, it is the duty of the court to consult it.   The date of an act of the Legislature is the time when the governor approved it.

We know, from an inspection of the published volume, that each chapter of the Code was passed by the two houses and approved by the governor as '' separate acts.''   When the sixty-six chapters (which compose the Code) had been thus passed and approved, they had force and effect as laws, without any thing more.   The eleventh section of the first chapter, as already remarked, had the single object in view of an orderly arrangement and publication.   There is this curious anomaly : The first section of the first chapter declares that the Code shall consist of that chapter '' and the following entitled chapters, to wit.''   Then follows an enumeration of sixty-one ; whereas the Code, as published and as adopted by the Legislature, contains sixty-six chapters, — five more than those enumerated.   These five additional chapters were '' respectively approved '' May 13th, April 22d, May 3d, 10th, and 12th, and are undoubtedly of equal force with the sixty-one named in the first chapter.   .

The final section of the several chapters is, '' that this act shall take effect on the first day of October, 1871 ;'' so that,

56 MISS. — 17

without the aid of the eighth section of the first chapter, the time of going into effect was fixed.

From this review of the mode and order of adopting the statutes, arranged into chapters according to the subjects, each chapter separately considered by the two houses, adopted by them, and approved by the governor, we must construe this entire legislation as passed at the same session, and if one part is irreconcilably inconsistent with another, give effect to that which *last* had the sanction and consent of the law-maker. As we have seen, the last section of a single act pre-vails over a prior one, though the act as a whole was approved on its final passage through the Senate and House of Represen-tatives, and approved as a whole by the governor; because the courts must assume that, in construing and arranging the plan of the act, the legislative mind expressed its ultimate purpose in the later section. In such case, the courts lay hold of the numerical order of the parts of the law as the test.

We have seen, also, that the same rule obtains in the con-struction of a code, where its materials are built up in consec-utive order and arrangement.

But the Code of 1871 furnishes incontestible evidence that the various subjects were considered in separate acts, called chapters, and that each subject and chapter received legisla-tive sanction on a particular day; and there is, therefore, no difficulty in determining the precise day when a particular part of the Code was adopted. If that can be ascertained, we must declare that the enactment of a later day annuls the in-consistent enactment of a former day.

It follows, then, that those sections which give the widow one-half of her husband's estate, when there are no children, or descendants of them, having been adopted by the Legisla-ture twenty or more days after the section which gave her all, must be construed as a repeal of the older and prior section by implication.

Sect. 1281 applies to dower, and gives the widow, as her dower, one-third of the real estate of which the husband died

seized or possessed, and of lands which he had before con~ veyed otherwise than in good. faith and for a valuable consideration. This ·dower estate *is for life.* If there are no children or descendants, the widow shall have " as·dower *one-half, etc., in fee-simple.*"

Sect. 1283. Where the estate of. the testator or intestate is insolvent, the widow shall only be endowed of one-third of the lands.

The conjoint effect of the two sections is, to endow the widow (for life) in every.case except one, — that is, where there is no *child or descendant,* etc., when she takes one-half. in fee- simple.

Sect. 1788 applies to the case of a husband who dies intes- tate. " His widow shall be *entitled* to his entire· estate, real and personal, *in fee-simple,* after payment of debts. But if there be a child or children, by that or a former marriage, or descendants, his widow shall only be entitled to dower, and shall have a child's part of the personal estate."

Sect. 1948 prescribes the course of descent of land (not devised), — namely, to the children and their descendants; and on failure of them, then to the next of kin. The widow is altogether pretermitted.

Sect. 1949 provides for her by saving to the widow, in all cases, her dower.

The precise question we have to deal with is, the right of the widow in lands of which the husband died seized, without children of that or any other marriage.

Under sect. 1948, the land would descend to the next of kin, subject to the dower of the widow, in all cases. The extent of the dower is defined by sects. 1281 and 1283. Under the former, she would take as her dower one-half of the land in fee- simple; unless the estate should be represented insolvent, when, under the latter, she would take as dower one-third of the land, — only a technical dower estate for life of dowress.

It is plain, from this comparison of the several provisions of the Code, that section 1788 is directly.in conflict with sect.

1281. The former gives the wife the entire estate, real and personal; whereas the latter only gives her, as dower, *one-half* the land in fee-simple. This section is also inconsistent with sect. 1282, which gives the widow one-half the personal estate, after payment of debts.

I cannot attach any special importance to the words " as dower," " in fee-simple." It is only meant to declare what estate the *widow* shall take. She takes by operation of the statute, as *widow*, one-half in fee-simple, as she takes in other circumstances, as in sect. 1283, one-third for life. By whatever name her estate may be called, she takes an estate as widow, under the several sections of the statute, which are absolutely inconsistent, irreconcilably repugnant. She cannot take both estates.

CAMPBELL, J., dissenting.

None of the provisions of the Code of 1857, in reference to dower, were embraced in the Code of 1871 as submitted to the Legislature, a much more satisfactory provision having been made for the widow, according to the view of the codifiers. The Legislature adopted so much of the work of the codifiers as gave to the widow all of the real and personal estate of her deceased husband, who had died intestate and left no child or children, or descendant of them, after payment of his debts, but rejected their proposal to drop the provision of the Code of 1857 on the subject of dower, and adopted, as part of the Code of 1871, sects. 1281, 1282, and 1283, from the Code of 1857, thereby introducing verbal conflict in the several provisions on the subject. In order to avoid the imputation to the Legislature of folly and absurdity, we must attribute this result to inadvertence.

These sections are contained in different chapters of the Code. That which gives the widow all of the estate of her deceased husband, who dies intestate, without child, or descendant of such, is found where it would naturally be looked for, — in the chapter regulating the relations of " Husband and Wife,"—

and hard by that section which gives to the husband, in case of the dying intestate of his wife, without child, or descendant of such, all of her property, thus dealing fairly between husband and wife. The section which gives the wife one-half of the real estate of her husband, as dower, is contained under the head of "Miscellaneous Provisions," at the close of the chapter on Chancery Courts, and seems to be out of place. It is, nevertheless, part of the Code, and to be given its proper effect as such.

The different chapters of the Code were approved at different times. That embracing sect. 1788 was approved April 17, 1871, and that containing sect. 1281 on the 13th of May, 1871.

The chapter "To provide for the adoption and publication of the Revised Code of Mississippi," and which declares of what chapters the Code shall consist, was approved on the 12th of May, 1871, one day before the approval of the chapter containing sect. 1281, and many other chapters, thus exhibiting the anomaly of adopting by anticipation several chapters which had not been approved, the fact being that these several chapters had been passed by the Legislature, but had not been approved by the governor, who subsequently approved the general chapter adopting the Code before he approved many of the chapters it adopted.

While the several chapters afterwards wrought into the Code were passed by the Legislature and approved by the governor at different times, it was not the purpose of the Legislature that these chapters, severally adopted, should take effect as *independent* acts *by virtue of their approval*, but the scheme was to make a Code, a complete whole, a harmonious body of statute law. To this end, the parts were considered and adopted, *not to take effect as parts*, but to be framed together, as was attempted to be done by the first chapter of the Code, into a whole. This final act of construction adopts as parts of this Code the chapters containing the contradictory provisions for the widow of an intestate dying without children, or descendants of them.

They are, therefore, of equal authority, being equally expressions of the legislative will on the same subject and at the same time, and it is not admissible to resort to the date of the approval of the several chapters to determine between them.

We are not at liberty to consider the numerical order of the sections as containing the earlier or later expression of the will of the Legislature, because the Legislature itself did not have regard to this, as evidenced by the fact that by sect. 11 of the adopting act (chap. 1 of the Code) power to rearrange chapters and to remodel the sections was conferred on the commissioner to be appointed to superintend the publication of the Code.

There is no place for an attempt to apply the doctrine sometimes applied to repugnant provisos and saving clauses, for it would · be entirely arbitrary to determine which is the purview and which the proviso or saving clause, or either.

The Code is to be viewed as a whole. It is to be considered as one act of the law-making power. · Part is to be compared with part, and each with every other, to ascertain, if possible, the intent of the law-makers. Their intent is to be gathered from what they have said.

*Uno flatu*, in adopting the Code, they have declared that, in a given state of case, the widow shall have half and she shall have all of her husband's estate. Which declaration shall prevail? As between the two, no preference can be given to one over the other, except by an arbitrary election. In no other way can full effect be given to *all* that the Legislature has declared, except by giving the widow all. Thereby she gets half as included in the whole, and thus she gets the larger provision made for her as comprehending the smaller; and both provisions of the Code on the subject are satisfied.

By reference to the law of descent, sect. 1948 of the Code, it is seen that the general rule established is, that the undevised estate of one dying without children, or descendants of children, descends to the brothers and sisters, or, if none of them or their descendants, to other enumerated kindred of the intes-

tate. This is the course of descent where there is not a widow of the intestate. But sect. 1788 provides for the special case of such an intestate leaving a widow, `and declares that she shall have all of his estate, real and personal, after payment of his debts. This is clearly an exception to the general course of descent; and unmistakably, with sects. 1948 and 1788 as the only ones in the Code, bearing upon this question, it would be held that where an intestate, without children or their descendants, left a widow, she should inherit *all* his estate, after payment of debts. Now, why limit the widow to the narrower exception in her favor? Both are made. One says she shall have all, and the other that she shall have half, of her husband's estate. Why arbitrarily deny the right of the widow to the broader exception clearly made in her favor? *Ut res magis valeat quam pereat.* The lesser is embraced in the greater. The whole includes the half, and the widow is entitled to all her husband's estate, after payment of debts.

If it is asked, Why prefer the widow to the heir by enforcing the broader exception in her favor? the answer is, she is not preferred to the heir, except to the precise extent declared by the Legislature; and to limit her to the narrower exception in her favor is to prefer the heir to her, in defiance of the legislative declaration in *her* favor. I so construe the several sections of the Code relating to this subject as to harmonize and give effect to all, as far as possible. The Legislature having declared against the heir, in favor of the widow, in one provision, and in none having declared expressly in favor of the heir as against the widow, I think we cannot, in favor of the heir, deny to her the benefit of the broader provision the Legislature has made for her.

The true view of the three sections — 1948, 1788, and 1281 — is that, where there is no widow, the brothers and sisters, or other enumerated kindred of the intestate, will inherit his estate; but if he leaves a. widow, she shall inherit all, after payment of debts, for the Legislature has said she shall have the half and the whole, and so the manifest legislative will,

as expressed, though blunderingly and stupidly, is seen to be that she shall have all of her husband's estate. To deny her this, is to nullify arbitrarily a legislative declaration in her favor, made on the specific subject of regulating the respective rights of husband and wife as to the property left at death, in order to allow the heir to claim under the general law of descent, which has no reference to the relation of husband and wife, and was not designed to affect it, but only to establish the general course of descent, leaving to the chapter on "Husband and Wife" to provide for their reciprocal rights as to the property of each other.

Sect. 1788 is a new provision, not contained in the former law, but adopted for the first time in the Code of 1871. The other sections mentioned were in force before. It must be assumed that sect. 1788 was introduced to effect what it provides for. It surely cannot be expunged from the Code; and, being there, it must have some effect, and it cannot have the force its plain language imports except by securing to the widow all of the estate of her husband in the state of case for which it provides. This construction accomplishes all that the Legislature has declared in favor of the widow. No other does.

Sects. 1788 and 1281 provide for different states of case, and each has an effect independent of the other. Sect. 1788 secures to the widow all of her husband's estate, after the payment of his debts. Sect. 1281 secures her *dower*, which is regardless of the debts of her husband, except as affects the *quantum* of his estate which she shall have as dower. Under sect. 1788 she may not be entitled to any thing, because of the consumption of the estate by debts, and then she may claim dower under sect. 1281. By sect. 1788 she would be entitled to a remainder vested in her husband, to be enjoyed after a particular estate of freehold, not terminated at his death, while as to such estate of her husband she would not be entitled to dower, because of want of *seizin* in her husband. By sect. 1281 she might claim and have dower in lands conveyed by her

husband during the coverture, otherwise than in good faith and for a valuable consideration, and whereof she had not relinquished her right of dower. Sect. 1788 applies alone to intestacy. Sect. 1281 applies to intestacy, or where the widow shall dissent from a will. It is thus seen that the two sections have separate and independent operation, and the question is, whether, at the point of repugnancy between them, we shall make that which limits the rights of the widow annul that which so plainly secures to her all of her husband's estate, or whether we shall effectuate the unmistakable legislative purpose in her behalf. Sect. 1281, if introduced with any intelligent purpose, was to secure to the widow that much, at least, in any condition of the husband's estate as to debts. It was for the benefit of the widow, sprung from a jealous regard for her welfare, and a determination to provide for her in any contingency. It was not to abridge her allowance or defeat the provision so appropriately made for her by sect. 1788. It is an express one, by clear and unambiguous language. The claim of the heir, based on sect. 1281, rests on an *implication* merely. The primary intention of the Legislature to secure to the widow all of her husband's estate, after the payment of debts, is clearly deducible, as I think, from the whole legislation on the subject; and this manifest purpose, so plainly expressed in one section, should not be defeated by a *mere implication*. The Legislature has nowhere declared that, as against the widow of a childless intestate, the heir shall have half of his estate. It has expressly declared, in sect. 1788, that in such case the widow shall have it all, after payment of debts. Sect. 1788 secures her all, after payment of debts. Sect. 1281 secures her *dower*, anyhow; so that, although there be debts enough to consume the estate, the widow shall have dower. One suits a solvent estate; the other an insolvent one. Can it be supposed that a Legislature thus careful to provide in any state of case for widows, intended by sect. 1281 to annul the just provision contained in sect. 1788, and that a remedial provision intended for her benefit in a

condition of things when the chief provision might be unavailing to her was designed to take from her one-half of what had been so carefully attempted to be secured to her? May we not properly say that the repugnancy introduced by sect. 1281 resulted rather from ignorance or inadvertence, and that it shall not defeat the clearly indicated purpose of the law-makers to secure the rights of the widow to the full extent declared by sect. 1788?

The rule of resorting to the later clause of a will or statute, as indicating the later intention of the testator or law-maker, is purely arbitrary, and to a great extent fanciful, springing rather from the necessity of some rule than from any just reason, and is not to be applied to the defeat of the manifest purpose of the testator or law-giver, where that can be collected from the context.

The question is, What was the intention of the maker? Ascertain that from all that is said, and mere words must give way to the higher purpose of effectuating the intention. Rejection, transposition, restriction of the meaning, enlargement, every device, will be employed to prevent a defeat of a clearly manifested primary purpose, and to secure the object had " most at heart " by the testator or law-maker. It is manifest that, in adopting sect. 1788, the Legislature had in view sect. 1281, for the former provides that where the deceased husband shall leave a child, or children, or descendants of such, his widow shall in that case be entitled only to dower; evincing clearly a consideration of the subject of dower in the very act of securing to the widow all of her husband's estate after payment of debts, where he should leave no child, or descendant of such, and maintaining the view that the Legislature did not regard the provision for dower, in sect. 1281, as abridging the rights secured to the widow by sect. 1788, but had both in mind, and intended one for one state of case and the other for another, so that the widow should surely be provided for by getting all, after payment of debts, or, if that did not avail, by getting dower. The widow may elect to take

under the one or the other section, according to the situation of her husband's estate.

Upon the application of *Frank Johnston* and *H. W. Walter*, of counsel for the appellees, the court granted a reargument of the case.

*W. S. Featherston* and *E. M. Watson*, of counsel for the appellants, again argued the case orally.

*Manning, Watson & Moore*, on the same side, filed a brief.

*H. W. Walter* and *Frank Johnson*, of counsel for the appellees, argued the case orally, and also filed a brief.

The judges adhered to their respective opinions delivered on the first argument.